T.C. Memo. 2001-155


UNITED STATES TAX COURT


MARVIN L. BARMES AND BARBARA J. BARMES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 11486-99.               Filed June 28, 2001.


Marvin L. Barmes and Barbara J. Barmes, pro sese.

<u>Timothy A. Lohrstorfer</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


Table of Contents

Respondent's Motion To Impose Sanctions . . . . . . . . . . . .  4

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . .  18

Petitioners' Businesses . . . . . . . . . . . . . . . . . . .  18

Petitioners' Real Properties . . . . . . . . . . . . . . . . 22

Petitioners' Bank Accounts . . . . . . . . . . . . . . . . .   23

Sovereignty Pure Trusts . . . . . . . . . . . . . . . . . .   26

Dealings with the State of Indiana . . . . . . . . . . . .   36
      Filings with the Knox County Recorder's Office . . . .   36
            Documents Relating to Sandbar Wholesale
                  Trust and Sandbar Real Estate Trust  . . .   36
            Warranty Deeds . . . . . . . . . . . . . . . . .   39
      Filing with the Assessor of the Township
            of Vincennes, Indiana . . . . . . . . . . . . . .   40
      Unemployment Compensation Claims with Respect to
            Barbara's Gift Shop and Barmes Wholesale  . . . .   41

Federal Employment Tax Returns  . . . . . . . . . . . . . .   48
      Federal Employment Tax Returns--Petitioners  . . . . .   48
      Federal Employment Tax Returns--Sandbar Wholesale
            Trust and Sandbar Real Estate Trust  . . . . . .   49

Federal Income Tax Returns  . . . . . . . . . . . . . . . .   50
      Petitioners' 1994 Federal Income Tax Return  . . . . .   50
      Petitioners' 1995 Federal Income Tax Return  . . . . .   51
      Federal Income Tax Returns--Sandbar Wholesale
            Trust and Sandbar Real Estate Trust  . . . . . .   53

Respondent's Examination of Petitioners' 1994
      and 1995 Joint Returns . . . . . . . . . . . . . . . .   53

Respondent's Communications with Petitioners with
      Respect to Sandbar Wholesale Trust and Sandbar
      Real Estate Trust . . . . . . . . . . . . . . . . . .   58

Notice of Deficiency . . . . . . . . . . . . . . . . . . .   62

Certain Pre-Trial Conduct of Petitioners . . . . . . . . .   63
      Petitioners' Position During Informal Discovery
            with Respect to the Automobile Depreciation
            Deductions at Issue . . . . . . . . . . . . . . .   64
      Petitioners' Trial Memorandum . . . . . . . . . . . .   64
      Petitioners' Motion To Dismiss . . . . . . . . . . . .   66

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . .   67

Preliminary Matters . . . . . . . . . . . . . . . . . . . .   67
      Petitioners' Position Regarding the Presumption
            of Correctness . . . . . . . . . . . . . . . . . .  68
      Petitioners' Position Regarding the Burden of Proof  .   72

      Petitioners' Reliance on Facts Found in <u>Barmes v.</u>
          <u>Commissioner</u>, T.C. Memo. 2000-254 . . . . . . .   73

Respondent's Determination Regarding Petitioners'
      Claimed Schedule C Gross Receipts . . . . . . . . . .   74

Respondent's Determination Regarding Petitioners'
      Claimed Depreciation Deductions . . . . . . . . . . .   79

Respondent's Determination Regarding the Accuracy-Related
      Penalty Under Section 6662(a) . . . . . . . . . . . .   81

Penalty Under Section 6673(a)(1) . . . . . . . . . . . . .   84

CHIECHI, <u>Judge</u>:  Respondent determined a deficiency in, and an accuracy-related penalty under section 6662(a)[1] on, petitioners' Federal income tax for 1995 in the amounts of $315,478 and $63,095.60, respectively.

The issues remaining for decision[2] are:

(1)  Did petitioners have unreported taxable income for 1995 in the amount of $890,719?  We hold that they did.

(2)  Are petitioners entitled to the depreciation deductions that they claimed for 1995 with respect to two automobiles?  We hold that they are not.

(3)  Are petitioners liable for the accuracy-related penalty under section 6662(a)?  We hold that they are.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Certain computational issues also remain for 1995, resolution of which flows automatically from our resolution of the determinations in the notice that we address herein.

(4)   Should the Court impose on petitioners a penalty under section 6673(a)(1)?  We hold that we should, and we shall impose such a penalty in the amount of $2,000.

Respondent's Motion To Impose Sanctions

On October 13, 2000, we issued an Order (October 13, 2000 Order) granting in part and denying in part respondent's motion to compel production of documents (respondent's motion to compel).[3]  In that Order, we directed petitioners to produce to counsel for respondent on or before October 19, 2000, those documents requested in respondent's request for production of documents (the requested trust[4] documents), which we considered to be documents of Sandbar Wholesale Trust and/or Sandbar Real Estate Trust.[5]  (We shall refer collectively to Sandbar Wholesale

---

[3]In a separate Order issued on Oct. 13, 2000, we denied respondent's motion to compel answers to respondent's interrogatories.  That was because respondent had conceded, and we agreed, that petitioners' reliance on the Fifth Amendment to the Constitution (Fifth Amendment) in support of their refusal to answer those interrogatories was warranted, since respondent was contemplating or anticipating the possibility of a future criminal investigation of petitioners.

[4]When referring in this Opinion to Sandbar Wholesale Trust and/or Sandbar Real Estate Trust, our use of the words "trust", "trusts", "trustees", "general managers", "certificates of beneficial interest", "capital unit certificates", and similar terms is for convenience only and is not intended to convey any meaning or have any significance for Federal income tax purposes.

[5]In the October 13, 2000 Order, we sustained petitioners' Fifth Amendment claim and denied respondent's motion to compel insofar as that motion pertained to those documents requested in respondent's request for production of documents, which we did

(continued...)

Trust and Sandbar Real Estate Trust as the trusts.) The re-
quested trust documents with respect to each of those trusts that
the October 13, 2000 Order directed petitioners to produce
included, inter alia, the trust agreement with any amendments
from tax year 1995 to the present, the certificates of beneficial
interest issued by the trust during or otherwise effective for
tax year 1995, any agreements between the trust and either
petitioner or both petitioners with respect to the use of the
trust assets by either or both of them, any compensation agree-
ments between petitioner Marvin Barmes (Mr. Barmes) and the trust
for tax years 1995 to the present, all capital unit certificates
issued by the trust from tax year 1996 to the present, all trust
accounting books and records for the period beginning with the
trust's purported creation through December 31, 1995, all trust
documents pertaining to distributions from the trust for the
period beginning with the trust's purported creation to the
present, and certain trust bank account information.

Petitioners objected on the following grounds (petitioners'
objections) to the production of the documents requested in
respondent's request for production of documents: (1) Relevancy
with respect to any documents requested regarding Sandbar Real
Estate Trust; (2) petitioners' lack of custody, possession, or

---

[5](...continued)
not consider to be documents of Sandbar Wholesale Trust and/or
Sandbar Real Estate Trust.

control over the documents requested in respondent's request for production of documents, if any such documents existed; (3) relevancy with respect to any documents requested for any tax periods other than 1995; and (4) the Fifth Amendment. In the October 13, 2000 Order, we considered and rejected each of the first three of petitioners' objections. In that Order, we considered and (1) sustained petitioners' Fifth Amendment claim insofar as it related to the production of petitioners' personal documents and (2) rejected that claim insofar as it related to the production of the requested trust documents.

In the October 13, 2000 Order, we cautioned petitioners that we would be inclined to impose sanctions under Rule 104(c) in the event that petitioners did not fully comply with the provisions of that Order requiring them to produce to counsel for respondent the requested trust documents.

On October 18, 2000, petitioners filed a motion to reconsider the October 13, 2000 Order (petitioners' motion to reconsider). In that motion, petitioners advanced essentially the same arguments which they had advanced in opposing respondent's motion to compel and which we rejected in the October 13, 2000 Order. On October 18, 2000, we denied petitioners' motion to reconsider.

On October 23, 2000, this case was called from the calendar (calendar call) at the Court's trial session in Indianapolis,

Indiana. At the calendar call, petitioners requested that the Court schedule the trial in this case on that day. At the calendar call, counsel for respondent informed the Court that petitioners had failed to comply with the October 13, 2000 Order and filed respondent's motion to impose sanctions (respondent's motion for sanctions). In that motion, respondent requested the Court to impose on petitioners pursuant to Rule 104(c) one or more sanctions because of their failure to comply with the October 13, 2000 Order.

We asked petitioners at the calendar call whether they had complied with the October 13, 2000 Order. Petitioners replied that they had not, but that they had filed with the Court petitioners' motion to reconsider. We reminded petitioners that we had denied petitioners' motion to reconsider. We then directed petitioners to produce the requested trust documents to counsel for respondent as soon as possible before trial and advised petitioners that we would impose sanctions on them if they failed to do so. At the conclusion of the calendar call, we informed the parties that we were taking respondent's motion for sanctions under advisement, and we restated that if petitioners did not produce the requested trust documents prior to the commencement of the trial in this case, the Court would impose sanctions on them because of their failure to do so.

Thereafter on October 23, 2000, this case was recalled from

the calendar for trial (recall of this case). At that recall, we asked petitioners whether they had complied with the October 13, 2000 Order. Petitioners stated that they had not complied with that Order and began to reassert as an objection to the production of the requested trust documents that they did not have custody or control over such documents. At the recall of this case, we reminded petitioners that the Court had previously rejected that contention in the October 13, 2000 Order. We also rejected that contention in our denial of petitioners' motion to reconsider. We advised petitioners at the recall of this case that we considered them to be willfully failing to comply with the October 13, 2000 Order.

We asked petitioners at the recall of this case whether they had any response to respondent's motion for sanctions. Petitioners replied by reasserting their Fifth Amendment claim as an objection to the production of the requested trust documents. We reminded petitioners at the recall of this case that in the October 13, 2000 Order the Court had carefully considered and rejected petitioners' Fifth Amendment claim insofar as it pertained to the requested trust documents, and we again asked petitioners whether they had any response to respondent's motion for sanctions. Petitioners stated that they did not have any response to that motion.

Thereafter, at the recall of this case, we proceeded with

the trial without acting on respondent's motion for sanctions, which remained under advisement. We proceeded with the trial without acting on that motion because, although we had informed petitioners at the calendar call and at the recall of this case that we would impose sanctions on them for their failure to comply with the October 13, 2000 Order, we had not had adequate time as of the beginning of the trial in this case to consider and decide what sanction(s) we would impose on petitioners.

Although not requested by the Court, on October 31, 2000, petitioners submitted, and the Court had filed, petitioners' response (petitioners' response) to respondent's motion for sanctions. In petitioners' response, petitioners reasserted essentially most of the same arguments that they had advanced in opposition to respondent's motion to compel, which we rejected in the October 13, 2000 Order, and that they had continued to advance in petitioners' motion to reconsider, which we denied on October 18, 2000.

In petitioners' response to respondent's motion for sanctions, petitioners also advanced an argument under the Fourth Amendment to the Constitution (Fourth Amendment). According to petitioners, Boyd v. United States, 116 U.S. 616 (1886), holds that an individual may not be compelled to produce his "private papers to establish a criminal charge against him, or to forfeit his property", id. at 622, and that no negative inferences may be

drawn from such individual's failure to do so, see id. at 621-622.  Petitioners' reliance on Boyd is misplaced.  That case involved the requested production of certain private books and papers of the claimants in the context of a forfeiture action by the United States.  See id. at 622, 624.  The United States Supreme Court (Supreme Court) held that both the Fourth Amendment and the Fifth Amendment prohibited the production of those private items in a forfeiture proceeding.[6]  See id. at 634-635.

In the instant case, the requested trust documents are not the private books and papers of petitioners.  Rather, they are the documents of Sandbar Wholesale Trust and/or Sandbar Real

---

[6]Although the Supreme Court acknowledged that a forfeiture suit by the United States was technically a civil proceeding, it characterized such an action as "in substance and effect a criminal one".  Boyd v. United States, 116 U.S. 616, 634 (1886).  The Supreme Court stated with respect to such suits:

> we think that they are within the reason of criminal
> proceedings for all the purposes of the Fourth Amend-
> ment of the Constitution, and of that portion of the
> Fifth Amendment which declares that no person shall be
> compelled in any criminal case to be a witness against
> himself; and we are further of [the] opinion that a
> compulsory production of the private books and papers
> of the owner of goods sought to be forfeited in such a
> suit is compelling him to be a witness against himself,
> within the meaning of the Fifth Amendment to the Con-
> stitution, and is the equivalent of a search and
> seizure--and an unreasonable search and seizure--within
> the meaning of the Fourth Amendment. * * *

Id. at 634-635.  In contrast to the forfeiture action considered by the Supreme Court in Boyd, the instant case is a civil pro-ceeding and may not in any way be characterized as criminal in nature.

Estate Trust, for which petitioners were appointed general managers and managing agents and, as such, had the same duties and responsibilities as the respective trustees of the trusts. That distinction is critical as far as the Supreme Court is concerned.  In United States v. White, 322 U.S. 694 (1944), the Supreme Court distinguished Boyd v. United States, supra, in cases where, as here, the requested documents are not those belonging to the individual personally but are those that the individual holds in his or her capacity as a representative of a so-called collective entity.  The Supreme Court stated:  "individuals, when acting as representatives of a collective group, cannot be said to be exercising their personal rights and duties nor to be entitled to their purely personal privileges."  Id. at 699 (distinguishing Boyd v. United States, supra).  On the instant record, we find that petitioners, as the appointed general managers and managing agents of both Sandbar Wholesale Trust and Sandbar Real Estate Trust, have no valid claims under the Fourth Amendment that would prevent production of the requested trust documents.[7]

---

[7]Nor would we find on the instant record that petitioners have a valid claim under the Fourth Amendment assuming arguendo that the requested trust documents were petitioners' private documents, rather than trust documents.  "Requiring taxpayers, who institute civil proceedings protesting deficiency notices, to produce records or face dismissal constitutes no invasion of privacy or unlawful search or seizure."  Edwards v. Commissioner, 680 F.2d 1268, 1270 (9th Cir. 1982), affg. per curiam an order of
(continued...)

Based on our examination of the record before us, we find that petitioners have willfully failed to comply with the October 13, 2000 Order and that they never had any intention of complying with that Order.  We further find that petitioners' willful flouting of the October 13, 2000 Order hampered respondent's ability to develop respondent's position in this case with respect to, inter alia, the determination in the notice to increase petitioners' Schedule C gross receipts for 1995.

Rule 104(c) provides that if a party fails to obey an order of the Court with respect to the provisions of, inter alia, Rule 72 relating to production of documents and things, the Court may make such orders as to the failure as are just.  Such orders may include, but are not limited to,

>        (1)  An order that the matter regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the case in accordance with the claim of the party obtaining the order.

>          *        *        *        *        *        *        *

>        (3)  An order * * * dismissing the case or any part thereof, or rendering a judgment by default against the disobedient party.

---

[7](...continued)
dismissal; see Coulter v. Commissioner, 82 T.C. 580, 583 (1984); Ebert v. Commissioner, T.C. Memo. 1991-629, affd. per unpublished order 986 F.2d 1427 (10th Cir., Feb. 23, 1993).  Of course, we previously found on the record before us that petitioners did have a valid claim for protection under the Fifth Amendment with respect to the production of their personal documents.  See supra note 5; see also supra note 3.

Rule 104(c)(1), (3).

In the instant case, respondent alleged the following in paragraph 7 of respondent's answer:

(a) On October 12, 1995, Marvin L. Barmes and Barbara J. Barmes established what purport to be "pure trusts" into which they, on or about October 12, 1995, purportedly transferred title to all their personal property, including their ownership interests in Marvin L. and Barbara J. Barmes, PTR, d/b/a Barbara's Gift Shop, and d/b/a Barmes Wholesale. The purported trusts are known as the Sandbar Real Estate Trust and the Sandbar Wholesale Trust.

(b) On October 18, 1995, Marvin L. Barmes and Barbara J. Barmes purportedly transferred title to three parcels of real estate to the Sandbar Real Estate Trust. These three parcels of real estate comprise all of the known real estate holdings of Marvin L. Barmes and Barbara J. Barmes, including their personal residence and the business location of Barbara's Gift Shop and Barmes Wholesale located at 114 and 120 Main Street in Vincennes, Indiana.

(c) Marvin L. Barmes and Barbara J. Barmes received no consideration in exchange for the purported transfer of property to the Sandbar Real Estate Trust and the Sandbar Wholesale Trust described in subparagraphs (a) and (b), above.

(d) Marvin L. Barmes and Barbara J. Barmes continued to operate and control the business known as Barbara's Gift Shop and Barmes Wholesale after the creation of the Sandbar Wholesale Trust, and have continued to enjoy the use of the parcels of real estate and the personal property after the purported transfers to the the [sic] Sandbar Real Estate Trust.

(e) During 1995, the trustees of both the Sandbar Real Estate Trust and the Sandbar Wholesale Trust are as follows: James Rabold, the brother of Barbara J. Barmes,[8] and the petitioners' daughters-in-law

_____

[8]The parties stipulated that during the year at issue James

(continued...)

Jennifer Burgess Barmes and Susan Thomas Barmes.

(f) Jennifer Burgess Barmes and Susan Thomas Barmes were employed by petitioners during 1995.

(g) Petitioners and the trustees of the Sandbar Real Estate Trust and the Sandbar Wholesale Trust have refused to provide to respondent's agents or officers information or documentation setting forth who the beneficiaries are of each trust.

(h) The Sandbar Wholesale Trust has not filed a Form 1041, U.S. Fiduciary Income Tax Return, for the tax year ended December 31, 1995.

(i) The taxpayer identification number used by the Sandbar Wholesale Trust, 52-9876145, is not a valid taxpayer identification number registered or otherwise recognized by the Internal Revenue Service.

(j) On March 14, 1996, petitioner Marvin L. Barmes, as the general manager of the Sandbar Wholesale Trust, executed under penalties of perjury Indiana State Form 11405, Business Tangible Personal Property Assessment Return, for the calendar year ended December 31, 1995.

(k) On the Indiana State Form 11405, Business Tangible Personal Property Assessment Return, the Sandbar Wholesale Trust, through its general manager, Marvin L. Barmes, stated that the trusts had total sales of $5,799,767.00 for the calendar year ended December 31, 1995, from the general retail and whole-sale activities of Barbara's Gift Shop/Barmes Wholesale conducted at 120/114 Main Street in Vincennes, Indiana.

---

[8](...continued)
Rabold was married to Carol Barmes, who is Mr. Barmes' sister. James Rabold is the brother-in-law, and not the brother, of Barbara J. Barmes. As corrected, par. 7(e) of respondent's answer should read as follows:

(e) During 1995, the trustees of both the Sandbar Real Estate Trust and the Sandbar Wholesale Trust are as follows: James Rabold, petitioners' brother-in-law, and the petitioners' daughters-in-law Jennifer Burgess Barmes and Susan Thomas Barmes.

(l)  On their personal income tax return for the tax year ended December 31, 1995, petitioners reported on Schedule C total gross receipts or sales of $4,217,062.00 for Barbara's Gift Shop and Barmes Wholesale conducted at 120 Main Street in Vincennes, Indiana.

(m)  Petitioners have continued to control the operations of their businesses, Barbara's Gift Shop and Barmes Wholesale, since the creation of the Sandbar Wholesale Trust in October 1995.

(n)  In the notice of deficiency, respondent determined that petitioners understated their net taxable income from their operation of Barbara's Gift Shop and Barmes Wholesale for the tax year ended December 31, 1995 by $890,719.00.

(o)  Based on the adjustment of $890,719.00 to net profit for the tax year 1995 from petitioners' operation of Barbara's Gift Shop and Barmes Wholesale, respondent determined that petitioners had a net profit of $793,881.00,[9] not a net loss of $96,883.00, as claimed by petitioners.

(p)  Utilizing the net profit percentage based on total sales from petitioners' 1994 personal income tax return of 13.83%, respondent determined petitioner's total sales for 1995 to be $5,740,282, as follows:

---

[9]Par. 7(o) of respondent's answer contains a mathematical error.  As corrected, such par. should read as follows:

(o)  Based on the adjustment of $890,719.00 to net profit for the tax year 1995 from petitioners' operation of Barbara's Gift Shop and Barmes Wholesale, respondent determined that petitioners had a net profit of $793,836.00, not a net loss of $96,883.00, as claimed by petitioners.

```
1995 net profit                              [10]$793,881.00
divided [by] net profit percentage                   13.83%
Gross Proft [sic]                            [10]$5,740,282.00
```

(q)  Based on total sales of $5,799,767.00 as reported by Marvin L. Barmes on the Indiana State Form 11405, Business Tangible Personal Property Assessment Return, for the calendar year ended December 31, 1995, and utilizing the net profit margin determined by respondent of 13.83 percent, net profit for from [sic] the operation of Barbara's Gift Shop and Barmes Wholesale for the tax year ended December 31, 1995 was $802,108.00.

(r)  The Sandbar Wholesale Trust is a mere sham for tax purposes and should be disregarded.

(s)  The taxable income attributed by petitioners to the Sandbar Wholesale Trust for tax year 1995 is taxable to petitioners for the taxable year ended December 31, 1995.

Where, as here, there is a failure to comply with an Order of the Court with respect to discovery, we may impose such sanctions as we deem appropriate.  See Rule 104(c); Durovic v. Commissioner, 84 T.C. 101, 119 (1985); Marcus v. Commissioner, 70

---

[10]Par. 7(p) of respondent's answer shows the 1995 net profit shown in par. 7(o).  As we indicated supra note 9, par. 7(o) of respondent's answer contains a mathematical error.  As corrected, the 1995 net profit is $793,836.  As corrected, par. 7(p) of respondent's answer should read as follows:

(p)  Utilizing the net profit percentage based on total sales from petitioners' 1994 personal income tax return of 13.83%, respondent determined petitioner's total sales for 1995 to be $5,739,957, as follows:

```
1995 net profit                       $  793,836.00
divided [by] net profit percentage           13.83%
Gross Proft [sic]                     $5,739,957.00
```

T.C. 562, 571 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980). In respondent's motion for sanctions, respondent requests, inter alia, that the Court deem established for purposes of the instant case the allegations in paragraph 7(a) through 7(s) of the answer. We find such a sanction to be appropriate under the circumstances presented here,[11] except that we do not consider it appropriate to deem paragraph 7(r) and 7(s) of the answer to be established. That is because those subparagraphs contain allegations that we find to be mixed allegations of fact and law. We shall grant respondent's motion in that the allegations in respondent's answer contained in paragraph 7(a) through 7(d), 7(e) as corrected to reflect the parties' stipulation, see supra note 8, 7(f) through 7(n), 7(o) and 7(p) with the mathematical errors corrected, see supra notes 9 and 10, and 7(q) are deemed established as facts for purposes of this case.[12] See Rule 104(c)(1); see also Durovic v. Commissioner, supra at 119; Marcus v. Commissioner, supra at 577.

---

[11]Rendering a judgment by default against petitioners in this case is a sanction that also is available to us under Rule 104(c)(3). See Rule 104(c)(3); see also Rechtzigel v. Commissioner, 79 T.C. 132, 139-140, (1982), affd. per curiam on other grounds 703 F.2d 1063 (8th Cir. 1983). However, we shall not impose such a sanction here since we proceeded with the trial in this case on Oct. 23, 2000.

[12]The trial record in this case also establishes as facts many of the allegations that, pursuant to Rule 104(c)(1), we are deeming established as facts for purposes of this case.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. As discussed above, certain other facts have been deemed established pursuant to Rule 104(c) and are incorporated herein as findings of fact by this reference.

Petitioners, who at all relevant times were husband and wife, resided in Indiana at the time the petition was filed.

Petitioners' Businesses

At all relevant times, petitioners operated two businesses, one under the name Barbara's Gift Shop and the other under the name Barmes Wholesale (collectively, the two businesses). During at least the period November 1994 through December 1996, Mr. Barmes was the individual who had ultimate control over Barbara's Gift Shop and Barmes Wholesale and the operations of those two businesses.

At all relevant times, Barbara's Gift Shop, a retail business located at 120 Main Street,[13] Vincennes, Knox County, Indiana, and Barmes Wholesale, a wholesale business located at 114 Main Street, Vincennes, Knox County, Indiana (collectively, the business locations), sold many of the same products, which included adult novelties and tobacco accessories. At those

_____

[13]The record is unclear as to whether the street on which the two businesses were located was called Main Street or East Main Street. Most of the references in the record are to Main Street, and, for convenience, we shall refer to the street on which the two businesses were located as Main Street.

times, the respective buildings in which petitioners conducted the two businesses consisted of at least two floors, and above Barbara's Gift Shop were an apartment and offices.[14] At all relevant times, one or two buildings were located on Main Street between the respective business locations of Barbara's Gift Shop and Barmes Wholesale.

On October 12, 1995, Mr. Barmes advised the respective employees[15] of Barbara's Gift Shop and Barmes Wholesale (collectively, business employees) (1) that the two businesses had become part of a trust and (2) that, after October 12, 1995, the business employees would no longer be employees of petitioners but would be independent contractors for Sandbar Wholesale Trust.

In a written notice to the business employees dated November 2, 1995, Mr. Barmes informed such employees that, as of November 1, 1995, Barbara's Gift Shop and Barmes Wholesale would no longer carry Workman's Compensation Insurance.

On October 20, 1995, Mr. Barmes issued a written statement (October 20, 1995 written statement) to the business employees,

---

[14]The record does not disclose whether the apartment and the offices located above Barbara's Gift Shop were separate and whether those offices served as offices for Barbara's Gift Shop only or for both Barbara's Gift Shop and Barmes Wholesale.

[15]When referring in this Opinion to the individuals who worked at the two businesses, our use of the words "employees", "independent contractors", "employer", and similar terms is for convenience only and is not intended to convey any meaning or have any significance for Federal tax purposes.

which stated in pertinent part:

To all Workers:

From Marvin Barmes, General Manager

You will receive a W-2 for the period worked for Marvin Barmes (Barbara's Gift Shop/Barmes Wholesale), January 1, 1995 thru October 12, 1995.

On October 12, 1995, Barbara's Gift Shop and Barmes Wholesale businesses became part of a Trust.  All workers were hired on by the Trust.

The Trust will issue 1099s for your worked [sic] performed thereafter.

All workers will be responsible for any/all taxes owed. Some may be required to file quarterly taxes.  You may want to consult your tax preparer, CPA or call IRS at 1-800-829-1040.

An additional 25 cents will be added to your hourly compensation, effective on compensation starting October 15, 1995.

    *       *       *       *       *       *       *

This is your last paycheck from Marvin L. Barmes, Sr.

Your vacation check is for accrued vacation pay.

Your next checks will be from the Trust, as compensation for your work.

"WORK FOR HIRE STATEMENT"

Clarifying the status of the worker!!!

1.  Supervisors have the right to approve the end product.
2.  Don't require salesperson to collect money from accounts on behalf of the *dba.
3.  Don't provide *dba car, business cards, samples, stationary [sic], and/or reimburse rent.
4.  Workers are not required to work exclusively for the *dba.
5.  Don't provide workers with insurance benefits.

6. Worker's hourly pay is subject to the work performed.
7. Workers are not entitled to participate in any *dba plans, arrangements or distributions pertaining to any health, bonus, pension, stock, profit-sharing or similar benefits.
8. Workers will not be given paid vacations.
9. When you need a day(s) or week(s) off. [sic] Please give a few days notice to your supervisor so they [sic] can have a worker prepared to do your job.

*dba refers to Barbara's Gift Shop/Barmes Wholesale.

At the bottom of the October 20, 1995 written statement was a blank space at which Mr. Barmes instructed each of the business employees to sign his or her name as an indication that each such employee had read and understood that written statement.

In addition to requiring the business employees to sign the October 20, 1995 written statement, Mr. Barmes required them to sign and, in certain instances, to complete certain other forms, including a document entitled "Affidavit of Citizenship and Domicile" (citizenship affidavit form) and Form W-8, Certificate of Foreign Status. The citizenship affidavit form stated in pertinent part:

> I was not born in a territory over which the United States is Sovereign and I am, therefore, not subject to its jurisdiction and I am not a citizen of the United States, as defined in 26 CFR Sec. 1.1-1(c). I am not liable for the Title 26, Internal Revenue Code (IRC), Subtitle A, [Sec.] 1 graduated income taxes for reason of my alienage[.]
>
> *       *       *       *       *       *       *
>
> I am a sovereign Citizen of one of the 50 contiguous states of America, under the Constitution and the Law.

As such, I am a "Nonresident Alien" {as such 'word of
art' is defined in IRC Sec. 7701(b)(1)(B)} under United
States Tax Laws [Title 26 United States Code and the
Internal Revenue Code][.]

26 CFR Sec 31.3401(a)(6)-1(b) "Remuneration paid to a
nonresident alien individual...is exempted from wages
and hence is not subject to withholding."

Petitioners issued to Susan Thomas Barmes and to Jennifer
Burgess[16] Form W-2, Wage and Tax Statement (Form W-2), for the
respective wages that they earned for the period January 1, 1995,
through October 12, 1995. As of October 23, 2000, the date of
the trial in this case, petitioners, Sandbar Wholesale Trust, and
Sandbar Real Estate Trust had not issued to the business employ-
ees Forms W-2 or Forms 1099-MISC, Miscellaneous Income (or any
other type of Form 1099), for any periods after 1995.

Petitioners' Real Properties

At all relevant times until at least October 12, 1995,
petitioners owned the two parcels of real property on which the
business locations were situated. At those times, petitioners
also owned approximately 17.73 acres of land located at 6393 E.
Overhead Road, Fritchton, Indiana (the Fritchton property), which
was approximately 6.5 miles from the business locations. Peti-
tioners' personal residence and an old farmhouse (old farmhouse)
were situated on the Fritchton property. In 1994, petitioners
remodeled the old farmhouse and furnished it as an office.

---

[16]During the year at issue, Susan Thomas Barmes and Jennifer
Burgess were petitioners' daughters-in-law.

Petitioners' Bank Accounts

At least during 1994 and 1995, petitioners owned and main-tained several bank accounts at Community Bank and Trust (Commu-nity Bank).

On October 13, 1995, Mr. Barmes completed five separate applications (account applications) in order to open five sepa-rate accounts with Community Bank, into each of which he made an initial cash deposit of $1,000. Each account application re-quired Mr. Barmes to provide the name and the taxpayer identifi-cation number (TIN) of the account owner. Mr. Barmes provided the following names and TIN's in the respective account applica-tions that he completed: (1) Sandbar Wholesale Trust--Barbara [sic] Gift Shop, TIN 52-9876145; (2) Sandbar Family Trust, TIN 52-9876111; (3) Sandbar Wholesale Trust--Barmes Wholesale, TIN 52-9876145; (4) Sandbar Wholesales [sic] Trust--Payroll, TIN 52-9876140; and (5) Sandbar Real Estate Trust, TIN 52-9876125.

Respondent did not issue TIN's 52-9876145 and 52-9876125. As of the date of the trial in this case, respondent had not issued employer identification numbers (EIN's) to Sandbar Whole-sale Trust or Sandbar Real Estate Trust.

In completing the five separate account applications, Mr. Barmes provided certain other information to Community Bank with respect to each account. In each account application, Mr. Barmes indicated that he was opening the account for a personal purpose

and not a business purpose, that only one signature was to be required in order for withdrawals to be made from the account, and that the account owner was a trust.

In the case of an account's being opened for a trust as owner of the account, the account application requested information as to the names and the addresses of the beneficiaries of the trust and whether the trust was a revocable trust or whether it had a pay-on-death designation. Mr. Barmes did not provide that information on any of the account applications that he completed.

In a section marked "BACKUP WITHHOLDING CERTIFICATIONS", the account application requested that the account owner certify under penalties of perjury that the TIN provided on the application was the correct TIN for that account owner and, if applicable, that the account owner certify that such account owner was not subject to backup withholding, was an exempt recipient, and/or was a nonresident alien. In each account application, Mr. Barmes indicated on behalf of the account owner, which in each instance he claimed was a trust, that the TIN provided in such application was the correct TIN for the trust, that the trust was not subject to backup withholding, and that the trust was not a United States person. Mr. Barmes signed each of the account applications that he completed under penalties of perjury, thereby certifying under such penalties that the foregoing

information that he provided on behalf of the account holder in each such application was correct. Below Mr. Barmes' signature in each account application, Mr. Barmes wrote the words "Without prejudice".

As of October 13, 1995, Community Bank listed (October 13, 1995 signature card) the following individuals as having signatory authority (signatories) over various separate Community Bank accounts maintained under the respective names Sandbar Real Estate Trust, Sandbar Wholesale Trust,[17] Sandbar Family Trust, and Land Vehicle Trust:[18] Marvin L. Barmes, Barbara Barmes, Marvin Barmes, Jr., Greg Barmes, Mark Barmes, Brian Barmes, Susan Thomas Barmes, Jennifer Burgess Barmes, and James Rabold.[19] The October 13, 1995 signature card identified Marvin L. Barmes as general manager and Susan Thomas Barmes, Jennifer Burgess Barmes, and James Rabold as trustees.

---

[17]Mr. Barmes opened three different accounts under the respective names Sandbar Wholesale Trust--Barbara's Gift Shop, Sandbar Wholesale Trust--Barmes Wholesale, and Sandbar Wholesale Trust--Payroll. The record does not disclose whether the individuals listed as signatories for the three accounts maintained under the name Sandbar Wholesale Trust were signatories for all three of those accounts.

[18]The record does not disclose that an account was opened at Community Bank under the name Land Vehicle Trust.

[19]Marvin Barmes, Jr., Greg Barmes, Mark Barmes, and Brian Barmes are sons of petitioners. During the year at issue, Susan Thomas Barmes was married to Greg Barmes, Jennifer Burgess Barmes was married to Mark Barmes, and James Rabold was married to Carol Barmes, who is Mr. Barmes' sister.

As of March 27, 1996, Community Bank listed (March 27, 1996 signature card) the following individuals as signatories for various Community Bank accounts maintained under the respective names Sandbar Real Estate Trust, Sandbar Wholesale Trust, Sandbar Family Trust, and Sandbar Land Vehicle Trust:[20]  Marvin L. Barmes, Barbara Barmes, Marvin Barmes, Jr., Greg Barmes, Mark Barmes, Brian Barmes, Susan Thomas Barmes, Kim Hall Barmes,[21] and James Rabold.  The March 27, 1996 signature card identified Marvin L. Barmes as general manager and Susan Thomas Barmes, Kim Hall Barmes, and James Rabold as trustees.

As of May 28, 1998, Community Bank listed (May 28, 1998 signature card) the following individuals as signatories for Community Bank account number 020005325-6 that was maintained under the name Sandbar Wholesale Trust--Barbara's Gift Shop: Marvin L. Barmes, Sr., Barbara Barmes, Greg Barmes, Brian Barmes, Susan Thomas Barmes, Kim Hall Barmes, and James Rabold.  The May 28, 1998 signature card identified Marvin L. Barmes, Sr. and Barbara Barmes as general managers and Susan Thomas Barmes, Kim Hall Barmes, and James Rabold as trustees.

Sovereignty Pure Trusts

At all relevant times, Sovereignty Pure Trusts (Sovereignty)

---

[20]The record does not disclose that an account was opened at Community Bank under the name Sandbar Land Vehicle Trust.

[21]Kim Hall Barmes married Brian Barmes on June 3, 1995.

was an entity that drafted for a fee so-called "Pure Trust Organizations" (pure trust organizations).  At those times, Sovereignty sold pure trust organizations through promotional materials.  The promotional materials used by Sovereignty during the year at issue were substantially the same as those that it used during 1998 (Sovereignty promotional materials).  The Sovereignty promotional materials identified an individual named Lynne Meredith as the person who drafted the pure trust organization documents that were sold by Sovereignty.  Those materials stated:  "Your customized Pure Trust Organization(s) will be mailed within 15 working days from the date that we receive your completed application."

Under the heading "ADVANTAGES OF A PURE TRUST ORGANIZATION", the Sovereignty promotional materials stated in pertinent part:

1.  NO INCOME TAX REQUIREMENTS!  As verified by the I.R.S., "A Pure Trust Organization has no tax requirements!" * * * A Pure Trust is not required to pay income tax on its earnings, gains or profits.  It does not file a tax return!

2.  COMPLETE PRIVACY.  A Pure Trust Organization holds assets, conducts business, and does banking in complete privacy.  IT IS NOT REQUIRED TO HAVE A SOCIAL SECURITY, E.I.N, OR OTHER FEDERAL IDENTIFICATION NUMBER!  Information about the assets, liabilities, and management of Pure Trust Organizations are completely confidential and are not accessible to the government or to the public.

3.  IRONCLAD ASSET PROTECTION!  A Pure Trust Organization protects property from unscrupulous judgment creditors, tax liens, levies and seizures, lawsuits, divorce claims and bankruptcy.

4.  <u>FREEDOM</u>:  A Pure Trust Organization is Free from Legislative Restrictions!
    a) The Pure Trust has NO accounting, bookkeeping or reporting requirements.
    b) The Pure Trust has NO Income Tax Withholding or Social Security requirements.
    c) The Pure Trust has NO quarterly tax payment or reporting requirements.

5.  <u>ELIMINATION OF PROBATE AND INHERITANCE TAXES</u>.  A Pure Trust is not required to pay Probate, Inheritance and Death Taxes and associated Legal Fees. A Pure Trust Organization is unaffected by the death of the Trustees or Beneficiaries.

6.  <u>MAINTAIN BENEFITS OF PROPERTY AND BUSINESS OWNERSHIP WITHOUT THE POTENTIAL LIABILITIES!</u> Trustees and Beneficiaries are not liable for the debts of the Pure Trust Organization and Pure Trust Organization CANNOT be invaded because of any debt incurred by the Trustees or Beneficiaries.

    $695 First Pure Trust Organization - $595 Each Additional Trust
    Liberty International Program - $1650 for (3) Pure Trusts

    Pays for itself in Legal Tax Savings
    Less than the Cost of a Corporation!  [Reproduced literally.]

Under the heading "Pure Trust Organization Information", the Sovereignty promotional materials stated in pertinent part:

    The best time for estate planning and asset protection is NOW, <u>before</u> you need it.  A Pure Trust Organization provides the surest road to freedom permitted by law, providing the ultimate in tax immunity, ironclad asset protection, privacy and estate planning. By transferring assets into properly structured Pure Trust Organizations, you can maintain complete control of, <u>or</u> all of the benefits of ownership without the inherent liabilities.  Assets "<u>held in trust</u>," are unaffected by bankruptcy, divorce, law suits, liens, levies or death.

A "Trust" is defined by Black's Law Dictionary as, "a right of property, real or personal, held by one party for the benefit of another." The "Trustee(s)" hold the legal and equitable Title to the property for the benefit of the Beneficiaries/ Capital Unit Holders. Although the trustees hold the property title, they do not own the property. The Trustee(s) is/are delegated the management authority for the Pure Trust Organization.

The Beneficiaries/ Capital Unit Holders also do not own the property but they have the right to all of the benefits, proceeds and profits of it. This is called the "beneficial interest." In a Sovereignty Pure Trust Organization the "beneficial interest" is contractually non-assignable and for that reason a Creditor may not legally attach it. The Beneficiaries/ Capital Unit Holders do not have any management control of the property.

A Pure Trust Organization is "created" and given life, though a "Contract in the Form of a Pure Trust Organization" which is referred to as the "instrument." [Reproduced literally.]

Under the heading "A Pure Trust Organization has No Income Tax Requirements", the Sovereignty promotional materials stated in pertinent part:

Like Corporations, Revocable Living Trusts are statutory and are subject to legislative control and taxation. A Revocable Living Trust is required to file a 1041 Form each year. As confirmed by the Chief of Accounting for the IRS, * * * "A Pure Trust Organization has no tax requirements." Therefore, there is no legal requirement for a Pure Trust Organization to file a tax return.

 *        *        *        *        *        *        *

A Pure Trust is not considered a taxable "Association" pursuant to tax law. Black's 6th Law Dictionary defines Association as follows: "What is designated as a trust or a partnership...may be classified as an association [only] if it clearly possesses [all] corporate attributes. Corporate attributes include:

[1] centralized management, [2] continuity of exis-
tence, [3] free transferability of interests,
[4] limited liability."

A Pure Trust Organization is not an "association"
or an "unincorporated association," because it does not
possess the same attributes of a corporation, such as
continuity of existence and free transferability of
[beneficial] interests.  Further, unlike a corporation,
a Pure Trust Organization is not an "artificial entity"
nor does it owe its' existence to the charter power of
the State.

A Pure Trust Organization is also not an alter ego
or a nominee for any trustee or beneficiary because no
one individual holds legal and equitable title AND
beneficial interest.  [Reproduced literally.]

Under the heading "IMPORTANT!  PLEASE READ THE FOLLOWING

BASIC RULES FOR STRUCTUTING [sic] A PURE TRUST ORGANIZATION

BEFORE FILLING OUT THE PURE TRUST ORGANIZATION APPLICATION", the

Sovereignty promotional materials stated:

THE STRUCTURE OF THE TRUST IN GENERAL

Structuring a Pure Trust Organization is
extremely simple if you just adhere to some basic
rules.  The Pure Trust Organization is like any
other person or business entity that has the power
to hold property, sell property, transfer prop-
erty, conduct business, etc.  It's simply an en-
tity that has a different name and ID number than
you.  Property is transferred into the name of the
Pure Trust as if it were any other person.

Once title to the property is in the name of
the Trust Organization, it is protected by the
ironclad Contractual and Constitutional
protections contained within the trust instrument
(document).  Because your right to contract cannot
be impaired, you have peace of mind in knowing the
property is safely protected.  You will have the
advantages of property ownership without the po-
tential liabilities.

THE NUMBER OF PURE TRUSTS NEEDED FOR MAXIMUM ASSET
PROTECTION

     To maximize the benefits of the Pure Trust
Organization, it is vital to put each asset that
has the potential of creating a liability into its
own separate Trust Organization so that it does
not jeopardize other assets.  In a lawsuit, lien,
levy, etc., the only assets that can be seized are
those assets in which title is held in the name of
the person or entity that created the liability.
For example, let's say your car was involved in a
serious accident that created a million dollars
worth of damages and the insurance company refused
to honor your claim.  Because your name was on the
Title to the car, if you are successfully sued, a
judgement will be entered in your name.  There-
fore, every asset held in your name would be sub-
ject to seizure.  The advantage to a Pure Trust
Organization is that it allows you to contractu-
ally move assets out of your name while still
retaining full control or all of the benefits of
the property.

     In the previous example, if you had the fore-
thought to put the Title to the car, in the name
of a Pure Trust Organization instead of your name,
only the Pure Trust entity" could be sued, under
its fictitious name.  Other assets held in your
name or in the names of other trusts would be
immune from judgement!

     If a court judgement, lien, or levy has been
filed against you, personally, only those assets
that you hold title to, in your own name are sub-
ject to seizure.  Property can be transferred into
a Pure Trust even after it has been unlawfully
liened or levied, in the absence of proper legal
procedures and a lawful Court Hearing.

     Businesses should always have a minimum of
two Pure Trust Organizations.  The first operating
entity should hold minimal assets, in case it is
ever sued.  Other Pure Trust Organizations should
then be established under different names to hold
and protect all other assets of the business orga-
nization.  Business equipment that has the poten-
tial of creating a liability should always be

segregated into separate trusts.

NAMING THE PURE TRUST ORGANIZATION:

Unless you are creating a Family Trust, do not use your last name or the word "Trust." Name your business as if it were a Sole Proprietorship. This will protect your privacy and will also make doing business and transferring property simpler.

THE TRUST IDENTIFICATION NUMBER:

Because a Pure Trust Organization has no tax requirements, it has no need for a Federal Employer Identification Number or a Social Security Number, which are necessary for tax reporting purposes only.

The Pure Trust Organization will be issued a nine-digit, internally generated, identification number for banking and identification purposes, underlined unrelated to taxes. This Trust Identification Number is private and will not be linked to any Federal or State Government agency. It will be included on your final Pure Trust Organization Document(s). Each Trust will be issued a separate number.

NAMING TRUSTEES AND BENEFICIARIES

The most important rule to remember when structuring your Trust Organization is that one individual cannot be BOTH a Trustee and a Beneficiary/Capital Unit Holder. It is the complete separation of these two entities that affords the Pure Trust Organization its protections. If the same person who holds the legal and equitable title, also has the beneficial interest or the right to proceeds, no trust has been created. The entity then is said to be operating as an "alter-ego" or as a "nominee" of the trust.

THE PROTECTOR:

The Protector has the power to terminate Trustees and/or appoint new Trustees. The Protector may also appoint "Successor Trustees" in the event a Trustee dies. A Protector cannot have any other position in the Pure Trust Organization. A Protector can be anyone, related or unrelated to you.

If you, as the original Exchanger (Settlor) are the only Trustee and a Successor Trustee has already been named, you do not need a Protector. A Protector eliminates a need to go to Court to change Trustees.

TRUSTEES

Trustees hold the legal and equitable title to the property in Trust, for the benefit of the Beneficiaries/Capital Unit Holders. They do not, however, actually own the property. A Trustee cannot also be a Beneficiary/Capital Unit holder. Trustees have no rights to the "beneficial interest" in the form of income and profits. However, they can receive a contractually agreed upon compensation in return for their Trustee services. Trustees have Management Control of the Pure Trust Organization. There can be one Trustee or as many Trustees as desired. All of the Trustees can work together in managing the Trust or any or all Trustee(s) can delegate management authority to one or more Managing Trustee(s) to transfer property, open and operate and bank accounts, and take care of the day to day operations.

### Adversarial (Unrelated) Trustees

In order to maintain the tax immunity qualities of the Pure Trust Organization, it is important that it is not considered a "Grantor" Trust, which is required to file a 1041 Form. According to the I.R.S.: "The title of 'grantor trust' arises when there is no trustee with averse interest." The words "adverse" or "adversarial" mean unrelated. The rule of structure is that; "the majority of trustees must have an interest 'adverse' or unrelated to that of the beneficiaries/capital unit holders. This means that if the beneficiaries are your wife/husband/children, the majority of trustees cannot be related to them. Therefore, for example, if you were a man and wanted to be a trustee and make your wife and children beneficiaries, you must also have at least two other unrelated Trustees. If you and your wife both want to be trustees, there must also be at least three other unrelated Trustees. Our company can provide adversarial (unrelated) trustees for you at a minimal cost. These trustees will delegate the authority to your Managing Trustee to open the

bank account, sign checks, transfer property, sign the minutes and make management decisions concerning the contract of trust.  If you are not related to the beneficiary(ies) you do <u>not</u> need adversarial trustees.

THE GENERAL MANAGER

Although it is typically the Trustees or Managing Trustee(s) that will be responsible for the management of the Trust, a General Manager may also be appointed for that purpose.  The General Manager is merely an employee of the Pure Trust and is not an integral part of it.  However, some individuals choose this position because they want to manage the Trust with privacy. When transferring title to real property and automobiles, it is necessary in include the name(s) of the Trustee(s) in addition to the name of the Pure Trust, as a matter of public record.  The General Manager's name, however, would not appear on title.  It would only be included within the trust minutes, which are totally private.

THE BENEFICIARY/CAPITAL UNIT HOLDERS

Beneficiaries/Capital Unit Holders have the right to the "<u>beneficial interest</u>" which is a right to the income, profits, and proceeds and use of the Pure Trust Organization.  However, in order to provide maximum asset protection, the trust must be "Pure."  That means that "<u>Beneficiaries/ Capital Unit Holders</u>" CANNOT have any management control of the Pure Trust Organization. The Trustee assigns the "Exchanger" (Settlor) 100 <u>capital units</u>, which represent 100% of the beneficial interest of the Pure Trust, in exchange for the property he or she conveys into the trust.  The Exchanger can then either keep all 100 Certificates or divide them in any manner among Beneficiaries of his or her choice.

BANK ACCOUNTS

Sovereignty Pure Trusts can also open a completely private bank account with no Federal ID Number or Social Security number at a major bank.  This account will be like any other checking account, except that it is completely private.  The cost for this is $125 per account.  [Reproduced literally.]

The Sovereignty promotional materials included copies of two letters. The first was a letter dated March 29, 1996, written by "Gregory P. Karl, CPA", and addressed to "Chuck Felthaus, Chief-Accounting Branch, Internal Revenue Service" in Philadelphia, Pennsylvania (Karl letter). The second was a letter dated December 17, 1996, written by "Charles F. Felthaus, Chief, Accounting Branch", and addressed to "Gregory Paul Karl" (Felthaus letter). The Karl letter stated in pertinent part:

> I have a number of Pure Trust clients and I have an urgent request. Please let me know the income tax requirements for a Pure Trust Organization as well as the proper procedure for obtaining an Internal Revenue Service issued Employer Identification Number for them.

The Felthaus letter stated in pertinent part: "We cannot process your application for a [sic] Employer Identification Number. A Pure Trust organization has no tax requirements, therefore a [sic] Employer Identification Number is not required."

The Sovereignty promotional materials also included a document entitled "Pure Trust Organization Application" (application). The application requested certain information, including the "settlor's"[22] name and address, the name of the pure trust organization, the names of the trustees, whether each trustee was to have signatory authority over any bank accounts, the names of the beneficiaries, and the number of so-called capital units each

_____

[22]The application stated: "The Settlor(s) is/are the individual(s) who will be transferring property into the 'Trust Estate'".

beneficiary was to receive.

Dealings with the State of Indiana

Filings with the Knox County Recorder's Office

Documents Relating to Sandbar
Wholesale Trust and Sandbar Real Estate Trust

On October 12, 1995, two documents, each of which consisted of three pages of printed forms (collectively, the two three-page documents), were filed with the Knox County Recorder's Office.[23] The first page of each of those documents, which was numbered "Page 1", was a cover page (cover page) on which appeared the heading "Common Law Contract and Declaration in the Form of a Private Pure Living Family Trust and Private Retirement Plan" and a mailing address for Sovereignty in Las Vegas, Nevada. Each page of each of the two three-page documents (each three-page document) contained identical language, except that one document made references to Sandbar Wholesale Trust and the number 52-9876145 and the other document made references to Sandbar Real Estate Trust and the number 52-9876125.

At the bottom of the cover page of each three-page document appeared the language "Common Law Copyright, Sovereignty Pure Trusts" and at the bottom of the second page of each three-page document appeared the language "Common Law Copyright, 1994 Sovereignty Pure Trusts, All Rights Reserved". No such language

---

[23]The record does not disclose who filed those documents with the Knox County Recorder's Office.

appeared at the bottom of the third page of each three-page document.

The second page of each three-page document, which was numbered "Page 24", stated:

> BY ALL THOSE PRESENT, for the purposes of protecting, conserving and enlarging the corpus of this "Trust Estate," for the benefit of the heirs of the Exchanger(s) and other holders of capital unit certificates, and for the establishment of a Private Retirement Plan to assure that such Certificate Holders may look forward, with anticipation, to a retirement with financial security and dignity, and without fear that this period of life will be lacking in the necessities to sustain them as human beings within our society, and for other purposes contained herein, the parties named herein, hereby establish this unimpairable Contract and Declaration in the form of a Common Law, Constitutional, Irrevocable, Sovereign Private Express, Pure Trust, Contractual Organization and Private Retirement Plan.
>
>    *      *      *      *      *      *      *
> IN WITNESS THEREOF, the Creator appoints and Trustee(s) have agreed to the terms, stipulations and covenants stated herein and, hereby, acknowledged the conveyance, delivery and acceptance of certain real and/or personal property listed in Schedule A and Addendum to be held in Trust according to the terms, herein. [Reproduced literally.]

Neither of the two three-page documents disclosed the identities of the "Exchangers" and the "Certificate Holders" that were referred to on the second page of each such document. Nor did either of those documents include the "Schedule A" and the "Addendum" that also were referred to on that page. (We shall refer to the language appearing on the second page of each three-page document as the declaration.)

The declaration appearing on the second page of each three-page document was signed in the name of Lynne Meredith, who was identified as "Sovereignty Pure Trusts, Creator", and in the names of James Rabold, Susan Thomas Barmes, and Jennifer Burgess,[24] all three of whom were identified as trustees. Petitioner Barbara Barmes (Ms. Barmes), in her capacity as a notary public, indicated on the second page of each three-page document that James Rabold, Susan Thomas Barmes, and Jennifer Burgess signed the declaration appearing on each such page.

The third page of each three-page document, which was unnumbered, was entitled "MINUTES OF THE PROCEEDINGS OF THE TRUSTEES". One such third page referenced Sandbar Wholesale Trust and the other referenced Sandbar Real Estate Trust.[25] (We shall refer to the third page of each three-page document as minutes.) The minutes stated, inter alia:

Marvin L. Barmes and Barbara J. Barmes is/are hereby

_____

[24]On Feb. 5, 1996, Jennifer Burgess was divorced from Mark Barmes. On Mar. 12, 1996, she resigned her duties as trustee of both trusts. On Feb. 12, 1999, Susan Thomas Barmes resigned her duties as trustee of both trusts. On May 15, 1999, James Rabold resigned his duties as trustee of both trusts. Beginning on Mar. 27, 1996, certain Community Bank records identified Kim Hall Barmes as a trustee of both trusts.

[25]The third page of the document referencing Sandbar Real Estate Trust was entitled "MINUTES OF THE PROCEEDINGS OF THE TRUSTEES OF; [sic] Sandbar Family Trust". We believe that that reference to Sandbar Family Trust was a typographical error, and we construe such minutes to be minutes relating to Sandbar Real Estate Trust. That is because all other references in such minutes were to the Sandbar Real Estate Trust.

appointed as General Manager(s), and Managing Agent(s), agreeing to act at all times in the best interest of the Company and its Capital Unit Certificate Holders and is/are, hereby, approved to open a bank account for * * * [Sandbar Wholesale Trust or Sandbar Real Estate Trust] and to be signer(s) on such account.

General Manager(s), shall accept the same duties and responsibilities as set forth for the Trustees of this Organization.

General Manager(s) shall hold no Title, legal or equitable, and no right to the Capital Unit interest, income or profit distributions of this "Trust Estate". Further, General Manager(s) shall not be liable for any of the debts of this "Trust Estate".

A separate Contract will be executed, setting forth compensation.

The undersigned hereby certifies that the above has been duly adopted by the Board of Trustees and direct that the minutes of these proceedings be recorded in and become a part of the official Company Minute Book.

The respective minutes for the trusts were signed in the names of James Rabold and Jennifer Burgess. Susan Thomas Barmes witnessed those signatures in her capacity as a notary public.

At all relevant times, the State of Indiana had no records of any business trust under any of the following names: Sandbar Wholesale Trust, Sand Bar Wholesale Trust, Sandbar Real Estate Trust, or Sand Bar Real Estate Trust.

Warranty Deeds

On October 18, 1995, three separate warranty deeds (deeds) executed on that date by petitioners were recorded with the Knox

County Recorder's Office.[26]  Those deeds pertained to the Fritchton property, petitioners' business location at 114 Main Street, and petitioners' business location at 120 Main Street, respectively (collectively, the three parcels of real estate). At the bottom of each of the three deeds, the following handwritten statement appeared:  "This instrument prepared by Marvin L. Barmes."  Each deed contained a mailing address for Sandbar Real Estate Trust at 120 Main Street, Vincennes, Indiana, and the following language:

> KNOW ALL MEN BE [sic] THESE PRESENTS:
>
> That I (we), Marvin L. Barmes and Barbara J. Barmes the undersigned grantor(s), for the consideration of Ten Dollars, and other valuable considerations, do hereby convey to Sandbar Real Estate Trust all rightm [sic] title and interest to and in the certain parcel of Real Property situated in Knox County, State of Indiana * * *

Although each deed stated nominal consideration for the conveyance described therein, petitioners did not receive any consideration for such conveyances.  After those conveyances were made, petitioners continued to enjoy the use of the three parcels of real estate.

Filing with the Assessor of
the Township of Vincennes, Indiana

On March 14, 1996, Mr. Barmes signed, under penalties of perjury, State of Indiana Form 103--Long Form, Business Tangible

---

[26]The record does not disclose who submitted the deeds for recording with the Knox County Recorder's Office.

Personal Property Assessment Return (Indiana business tangible personal property assessment return).  In that return, Mr. Barmes reported the name of the taxpayer as Sandbar Wholesale Trust and the Federal identification number belonging to that taxpayer as 52-9876145.  Mr. Barmes reported in the Indiana business tangible personal property assessment return that the taxpayer's Federal income tax year ended on December 31, 1995, and that the name under which Federal income taxes were filed was Sandbar Wholesale Trust.  In that return, Mr. Barmes also reported that the names under which the businesses were conducted were Barbara's Gift Shop and Barmes Wholesale and that the businesses were not conducted in the form of a trust but were conducted in the form of what Mr. Barmes described as an "Unincorporated Business Organization".  Mr. Barmes further reported in the Indiana business tangible personal property assessment return that the business properties were located at "120/114 Main Street" and that the businesses did not have any other locations in the State of Indiana.  In that return, Mr. Barmes also reported that the two businesses had total sales during 1995 of $5,799,767.

Unemployment Compensation Claims with Respect
to Barbara's Gift Shop and Barmes Wholesale

At all relevant times, the State of Indiana Department of Workforce Development (Department of Workforce Development) administered claims for unemployment insurance benefits and required employers to file quarterly reports and make payments

with respect to such claims. At those times, as part of its administration of such claims, the Department of Workforce Development established and maintained a separate account for each employer who had employees working in the State of Indiana, including an account for Barbara's Gift Shop. The Department of Workforce Development maintained such an account for Barbara's Gift Shop at all relevant times, at least through the year 1997. Prior to January 1, 1996, Barbara's Gift Shop timely filed quarterly reports with the Department of Workforce Development and maintained its employer account in good standing (i.e., made payments into that account). During the two-year period 1996 through 1997, the Department of Workforce Development continued to maintain an employer account for Barbara's Gift Shop; however, Barbara's Gift Shop did not timely file quarterly reports or make any payments into its employer account.

Beginning no later than January 10, 1997, the Department of Workforce Development maintained an employer account for Sandbar Wholesale Trust. The Department of Workforce Development established that account and assigned the number 413446 to that account on a date not disclosed by the record after having received a certain number of claims for unemployment benefits from individuals who claimed (e.g., by presenting canceled checks) that they had received wages from an entity using the name Sandbar Wholesale Trust. In order to establish an employer

account for Sandbar Wholesale Trust, the Department of Workforce Development requested certain information and documentation from petitioners on a date not disclosed by the record. However, the Department of Workforce Development did not receive any response from petitioners with respect to the information and documentation requested.

On January 3, 1997,[27] Jill Beamon (Ms. Beamon) made a claim for unemployment benefits with the State of Indiana Department of Employment and Training Services (Department of Employment and Training Services).[28] On January 7, 1997, in connection with Ms. Beamon's claim, a claims deputy with the Department of Employment and Training Services (claims deputy) completed a form entitled "REQUEST FOR INSPECTION AND WAGE INFORMATION" (request for inspection and wage information form), which Ms. Beamon had

---

[27]The date Jan. 3, 1996, appeared on the form that Jill Beamon, who worked at Barmes Wholesale from November 1994 to Dec. 23, 1996, signed when she made her claim for unemployment benefits with the Ind. Department of Employment and Training Services. However, it is clear from the record that that form was actually signed on Jan. 3, 1997, and that the year 1996 was written on that form by mistake.

[28]At all relevant times, the Department of Workforce Development was comprised of four entities, which included the Department of Employment and Training Services. See Ind. Code Ann. sec. 22-4.1-2-2 (Michie 1997). The Department of Employment and Training Services included an unemployment insurance board and an unemployment insurance review board. See id. at sec. 22-4.1-2-2(1).

signed on January 3, 1997[29] (Ms. Beamon's request for inspection and wage information form).  Sandbar Wholesale Trust was identified as the employer on that form.

At all relevant times, the Department of Employment and Training Services used the request for inspection and wage information form whenever (1) an individual made a claim for unemployment benefits, and (2) the Department of Employment and Training Services did not have a record of wages having been paid by the individual's employer.  After having completed the request for inspection and wage information form, the claims deputy sent that form to an audit examiner with the Department of Employment and Training Services (audit examiner) in order to conduct an investigation of the claim.  After having conducted an investigation, the audit examiner reported the results of the investigation in the request for inspection and wage information form.

On January 10, 1997, an audit examiner who had conducted an investigation with respect to an entity using the name Sandbar Wholesale Trust reported the results of that investigation[30] in Ms. Beamon's request for inspection and wage information form.

---

[29]The date Jan. 3, 1996, appeared on the request for inspection and wage information form that Ms. Beamon signed.  However, it is clear from the record that that form was actually signed on Jan. 3, 1997, and that the year 1996 was written on that form by mistake.  See supra note 27.

[30]That investigation occurred on a date not disclosed by the record between Jan. 3 and 10, 1997.

That investigation revealed that an account had been established with the Department of Workforce Development for Sandbar Wholesale Trust, but that that entity had not reported to the Department of Workforce Development any wages paid by it during the first three quarters of 1996. The audit examiner indicated in Ms. Beamon's request for inspection and wage information form that, although he had made contact with the entity identified as Sandbar Wholesale Trust, he received no response or cooperation from that entity.[31]

On January 28, 1997, the Department of Workforce Development issued a notice (January 28, 1997 notice) addressed to "Sandbar Wholesale Trust, Barbara's Gift Shop, 120 Main Street, Vincennes, IN 47591". That notice showed the number (account number 413446) that the Department of Workforce Development had assigned to the

---

[31]Ms. Beamon's request for inspection and wage information form contained at least three different sets of handwriting, one that belonged to Ms. Beamon, one that belonged to the claims deputy responsible for completing that form, and one that belonged to the audit examiner responsible for conducting the investigation with respect to Ms. Beamon's claim. It is clear from our examination of Ms. Beamon's request for inspection and wage information form that the audit examiner changed the information that was originally reported in that form as the "Employer" and "Account Number". The audit examiner identified "Sandbar Wholesale Trust, Barbara's Gift Shop" as the "Employer" and listed 413446 as the "Account Number" in that form. Account number 413446 was the account number assigned by the Department of Workforce Development to Sandbar Wholesale Trust. We are unable to determine from Ms. Beamon's request for inspection and wage information form who was originally identified in that form as the "Employer" and what number was originally listed in that form as the "Account Number".

account that it maintained for Sandbar Wholesale Trust.  The
January 28, 1997 notice indicated that Ms. Beamon had made a
claim for unemployment compensation and that there was a poten-
tial liability for unemployment insurance benefit charges as a
result of that claim.

On February 3, 1997, Mr. Barmes wrote the following state-
ment, which he signed as general manager, on the bottom of a copy
of the January 28, 1997 notice:  "Sandbar Wholesale Trust did not
open an account with Indiana Department of Workforce Development.
Sandbar Wholesale Trust does not now [have] or ever have [sic]
had employees".

On March 3, 1997, the Department of Workforce Development
issued another notice (March 3, 1997 notice) addressed to "Sand-
bar Wholesale Trust, Barbara's Gift Shop, 120 Main Street,
Vincennes, IN 47591".  That notice showed the same Department of
Workforce Development employer account number for Sandbar Whole-
sale Trust as shown on the January 28, 1997 notice.  The March 3,
1997 notice indicated that Ms. Beamon had made a claim for
unemployment compensation and that there was a potential liabil-
ity for unemployment insurance benefit charges as a result of
that claim.

At the bottom of a copy of the March 3, 1997 notice, on
March 6, 1997, Susan Thomas Barmes signed the following typed
statement as trustee and "without prejudice":  "Sandbar Wholesale

Trust did not open this account and has paid no money into this account.  J A Beamon was an independent contractor starting October 13, 1995 until December 23, 1996."

On May 7, 1997, the Department of Workforce Development issued a notice to Sandbar Wholesale Trust entitled "Notice of Complete Disposition of Business to Acquirer" (May 7, 1997 notice).  That notice stated:

> YOU [SANDBAR WHOLESALE TRUST] BECAME THE SUCCESSOR
> EMPLOYER TO THE NAMED DISPOSER [MARVIN L. & BARBARA J.
> BARMES] UNDER THE PROVISIONS OF THE INDIANA CODE 22-4-
> 9-3.  IN ACCORDANCE WITH THE PROVISIONS OF THE ACT,
> YOUR ACCOUNT ASSUMED THE EMPLOYMENT EXPERIENCE OF YOUR
> PREDECESSOR.  YOUR CONTRIBUTION RATE FOR THE YEAR OF
> ACQUISITION IS 1.1000%.  YOUR CONTRIBUTION RATE FOR THE
> CURRENT YEAR IS 5.5000%.
>
> IF YOU DISAGREE WITH THE DETERMINATION, YOU MAY FILE A
> FORMAL WRITTEN PROTEST WITHIN FIFTEEN (15) DAYS FROM
> THE DATE OF THIS NOTICE.  PLEASE USE YOUR NEW ACCOUNT
> NUMBER 413446 ON ALL FUTURE CORRESPONDENCE.  ADDITIONAL
> INFORMATION REGARDING YOUR RESPONSIBILITIES IS BEING
> SENT UNDER SEPARATE COVER.
>
> OUR RECORDS SHOW YOU ACQUIRED 100% OF THE BUSINESS ON
> 10/12/95 FROM DISPOSER:  138071.

In response to the May 7, 1997 notice, on May 11, 1997, petitioners executed a document entitled "AFFIDAVIT" and "FORMAL WRITTEN PROTEST" (protest affidavit).  In the protest affidavit, petitioners stated:

> Sandbar Wholesale Trust that acquired dba Barmes Whole-
> sale/dba Barbara's Gift Shop did not become the succes-
> sors of the employees.  They were all terminated prior
> to the business transfers.  Marvin L. & Barbara J.
> Barmes let their employees go before the transfer of
> the business and they were not passed onto Sandbar
> Wholesale Trust.

Sandbar Wholesale Trust managers took over and told the former employees of Marvin L. & Barbara J. Barmes they could be contracted by Sandbar Wholesale Trust and would have to fill out new paperwork, which included; Work for Hire Statement, U.S. Department of Justice Immigration and Naturalization Service Form I-9, Late/Absenteeism Policy, Affidavit of Citizenship and Domicile, Access to Trade Secrets and Confidential Information and Form W-8. * * * No Form W-4 filled out.

Upon the completion of the above paperwork they would be Independent Contractors for Sandbar Wholesale Trust.

Enclosed you will find two letters. One from Gregory Paul Karl, CPA to Internal Revenue Service. The other from Internal Revenue Service, Chief Accounting Branch, Charles F. Felthaus to Gregory P. Karl, CPA. Sandbar Wholesale Trust is a Pure Trust. A Pure Trust organization has no tax requirements, therefore an Employer Identification Number is not required. [Reproduced literally.]

The two letters to which petitioners referred in the protest affidavit were copies of the Karl letter and the Felthaus letter that Sovereignty included in its promotional materials and provided to petitioners.

Federal Employment Tax Returns

Federal Employment Tax Returns--Petitioners

On July 7, 1995, Ms. Barmes signed Form 941, Employer's Quarterly Federal Tax Return (Form 941), for the quarter ended June 30, 1995, which was filed under the name "Marvin L. and Barbara J. Barmes PTR", EIN 35-1305131. That form reflected total wages, tips, and other compensation paid by Marvin L. and Barbara J. Barmes PTR in the amount of $304,990.23.

On October 5, 1995, Ms. Barmes signed Form 941 for the

quarter ended September 30, 1995, which was filed under the name "Marvin L. and Barbara J. Barmes PTR". That form reflected total wages, tips, and other compensation paid by Marvin L. and Barbara J. Barmes PTR in the amount of $325,414.97.

On January 16, 1996, Ms. Barmes signed Form 941 for the quarter ended December 31, 1995, which was filed under the name "Marvin L. and Barbara J. Barmes PTR", EIN 35-1305131. That form reflected total wages, tips, and other compensation paid by Marvin L. Barmes and Barbara J. Barmes PTR in the amount of $92,179.53.

On March 11, 1997, Mr. Barmes signed Form 941 for the quarter ended March 31, 1997, which was filed under the name "Marvin L. and Barbara J. Barmes PTR", EIN 35-1305131. In that form, Mr. Barmes wrote "Nothing to report", checked the box indicating that Marvin L. and Barbara J. Barmes PTR did not have to file returns in the future, and stated that the date on which final wages were paid by Marvin L. and Barbara J. Barmes PTR was October 12, 1995.

Federal Employment Tax Returns--Sandbar
Wholesale Trust and Sandbar Real Estate Trust

As of the date of the trial in this case, neither Sandbar Wholesale Trust nor Sandbar Real Estate Trust had filed a Federal employment tax return or paid any Federal employment tax.

Federal Income Tax Returns

### Petitioners' 1994 Federal Income Tax Return

Petitioners filed Form 1040, U.S. Individual Income Tax Return for 1994 (petitioners' 1994 joint return), which they signed on March 10, 1995. In that return, petitioners reported taxable income of $837,210. Such taxable income did not include any wages or salaries.

Petitioners' 1994 joint return included Schedule C, Profit or Loss From Business (1994 Schedule C). The 1994 Schedule C requested, and petitioners provided, inter alia, the following information:

| Information Requested | Information Provided |
|---|---|
| Name of proprietor | Marvin L. Barmes |
| Principal business or profession, including product or service | Retail and wholesale, general merchandise |
| Business name | Barbara's Gift Shop and Barmes Wholesale |
| Employer identification number (EIN) | 35-1305131 |
| Business address | 120 Main St, Vincennes, IN 47591 |
| Accounting method | Accrual |
| Method used to value closing inventory | Cost |
| Gross receipts or sales (gross receipts) | $5,445,178 |
| Returns and allowances | 370 |
| Cost of goods sold | 2,820,049 |
| Gross profit | 2,624,759 |
| Other income | 106,567 |
| Gross income | 2,731,326 |
| Total expenses | 1,871,671 |
| Expenses for business use of your home | 0 |
| Net profit or (loss) | 859,655 |
| Inventory at beginning of year | 411,442 |
| Purchases less cost of items withdrawn for personal use | 2,850,804 |
| Cost of labor | 0 |
| Materials and supplies | 0 |
| Inventory at end of year | 442,197 |

The percentage of gross profit reported in the 1994 Schedule C to gross receipts reported in that schedule was 48.2 percent.

Included in the total expenses reported in petitioners' 1994 Schedule C was automobile depreciation in the amount of $5,920 for a Cadillac and a Corvette (petitioners' two automobiles). Petitioners purchased both of those automobiles in 1994, the Cadillac for $39,215 and the Corvette for $30,090. Attached to petitioners' 1994 joint return was Form 4562, Depreciation and Amortization (Including Information on Listed Property) (Form 4562). In Part V, Listed Property--Automobiles (Part V), Section B--Information on Use of Vehicles (Section B) of that form, petitioners claimed total miles and total business miles of 3,500 with respect to the Cadillac and 3,200 with respect to the Corvette. In Part V, Section A--Depreciation and Other Information (Section A) of that form, petitioners indicated that they had written evidence to support the claimed business use of petitioners' two automobiles.

Petitioners' 1995 Federal Income Tax Return

Petitioners filed Form 1040, U.S. Individual Income Tax Return for 1995 (petitioners' 1995 joint return), which they signed on April 3, 1996, "Without Prejudice". In that return, petitioners reported no wages or salaries and no tax due.

Petitioners' 1995 joint return included Schedule C (1995 Schedule C). In the 1995 Schedule C, petitioners reported the

same information with respect to the name of the proprietor, principal business, business name and address, EIN, accounting method, and method used to value closing inventory as they had reported in the 1994 Schedule C.  In addition, the 1995 Schedule C requested, and petitioners provided, inter alia, the following information:

| Information Requested | Information Provided |
| --- | --- |
| Gross receipts | $4,217,062 |
| Returns and allowances | 16 |
| Cost of goods sold | 2,340,822 |
| Gross profit | 1,876,224 |
| Other income | -- |
| Gross income | 1,876,224 |
| Total expenses | 1,973,107 |
| Expenses for business use of your home | -- |
| Net profit or (loss) | (96,883) |
| Inventory at beginning of year | 442,197 |
| Purchases less cost of items withdrawn for personal use | 1,898,625 |
| Cost of labor | -- |
| Materials and supplies | -- |
| Inventory at end of year | 0 |

Included in the total expenses reported in the 1995 Schedule C was automobile depreciation in the amount of $9,400 for petitioners' two automobiles.  Attached to petitioners' 1995 joint return was Form 4562.  In Part V, Section B of that form, petitioners claimed total miles and total business miles of 5,000 with respect to the Cadillac and 3,000 with respect to the Corvette.  In Part V, Section A of that form, petitioners indicated that they had written evidence to support the claimed business use of petitioners' two automobiles.

As of the date of the trial in this case, petitioners had

not filed Federal income tax returns for tax years after 1995.

Federal Income Tax Returns--Sandbar
Wholesale Trust and Sandbar Real Estate Trust

As of the date of the trial in this case, neither Sandbar Wholesale Trust nor Sandbar Real Estate Trust had filed a Federal income tax return or paid any Federal income tax.

Respondent's Examination of
Petitioners' 1994 and 1995 Joint Returns

On April 30, 1996, respondent's revenue agent Jon Eric Powell (revenue agent Powell) made initial contact with petitioners via the telephone with respect to respondent's examination of petitioners' 1994 joint return. Shortly thereafter, revenue agent Powell sent petitioners a letter (examination letter) formally notifying petitioners that their 1994 joint return was under examination. In response to the examination letter, on a date after April 30, 1996, that is not disclosed by the record, petitioners indicated to revenue agent Powell that they did not have to provide him with any records with respect to respondent's examination of their 1994 joint return. Consequently, on a date before May 30, 1996, that is not disclosed by the record, revenue agent Powell issued a summons (summons) to petitioners, which required them to appear before him on May 30, 1996, and to produce certain records with respect to respondent's examination of petitioners' 1994 joint return.

On May 30, 1996, in response to the summons, petitioners met

with revenue agent Powell (May 30, 1996 meeting).  During that meeting, revenue agent Powell questioned petitioners about the information requested in the summons with respect to petitioners' 1994 joint return, and petitioners responded that they were not required under the Fourth and Fifth Amendments to provide such information to respondent.  Consequently, revenue agent Powell ended the May 30, 1996 meeting.

During the course of the examination of petitioners' 1994 joint return, on a date after April 30, 1996, and before May 20, 1996, that is not disclosed by the record, revenue agent Powell received a report (CID report) from the Criminal Investigation Division (CID) of the Internal Revenue Service (IRS).  The CID report indicated that Barbara's Gift Shop had failed to file certain Federal employment tax (employment tax) returns and had, in the opinion of the CID, arbitrarily changed the classification of its workers from employees to independent contractors. Revenue agent Powell became aware from reading the CID report that Sandbar Wholesale Trust was formed sometime during October 1995.  On May 20, 1996, revenue agent Powell forwarded the CID report to respondent's revenue officer Shawn Kennedy (revenue officer Kennedy) for further investigation of the employment tax issues contained therein.

During the course of the examination of petitioners' 1994 joint return, on a date after May 30, 1996, and before November

6, 1996, that is not disclosed by the record, revenue agent Powell received petitioners' 1995 joint return from the Internal Revenue Service Center in Cincinnati, Ohio. Revenue agent Powell reviewed that return and compared it with petitioners' 1994 joint return. That comparison disclosed to revenue agent Powell that in the 1995 joint return there were: (1) A significant decrease from 1994 to 1995 in the gross receipts that petitioners reported in the respective Schedules C of petitioners' 1994 joint return and 1995 joint return, (2) an ending inventory for Barbara's Gift Shop for 1994 of $442,197 and an ending inventory for that business for 1995 of $0, and (3) an increase from 1994 to 1995 in the expenses that petitioners claimed in the respective Schedules C of petitioners' 1994 joint return and 1995 joint return. As a result, revenue agent Powell formally commenced an examination of petitioners' 1995 joint return.

Although revenue agent Powell became aware through the CID report of certain employment tax issues involving Barbara's Gift Shop and Sandbar Wholesale Trust, he concluded that that information did not affect his examination of petitioners' 1994 and 1995 joint returns, and he did not make any inquiries of petitioners regarding Sandbar Wholesale Trust during his examination of those joint returns. Nor did petitioners allude to Sandbar Wholesale Trust or to any purported transfer of the two businesses to that trust during that examination.

On November 6, 1996, revenue agent Powell had a telephone conversation with Mr. Barmes during which he advised Mr. Barmes that he had completed an examination report with respect to petitioners' 1994 and 1995 joint returns (examination report) that contained certain adjustments which he had made to those returns.  During that telephone conversation, revenue agent Powell asked Mr. Barmes whether Mr. Barmes intended to provide any information or documentation to the IRS to refute those adjustments.  At no time did Mr. Barmes provide any information or documentation to the IRS to refute or otherwise respond to the adjustments contained in the examination report.

On November 16, 1996, each petitioner executed an affidavit, both of which respondent received on November 20, 1996.  Each of those affidavits stated in pertinent part:

1.  *I am a "natural born free Citizen" adult Constitutionally, aka USA National, of Indiana Republic by birth, thus of America, and a temporary inhabitant living in Knox County, Indiana Republic; thankfully endowed by our Creator God with Unalienable Rights partially enumerated in America's founding organic documents, which I have never with knowingly intelligent acts waived * * *

2.  Recent diligent studies have convinced me of the above, and that as such I am not "subject to" the territorially-limited "exclusive Legislation" and its foreign jurisdiction mandated for Washington, D.C. etc. * * *, including its "internal" government organizations therein or by contract adhesioned thereto across America.  And neither are millions of other such Citizens, unless they have provided "WAIVERS of Constitutional Rights" with "knowingly intelligent act" (contracts with

such government[s]) "with sufficient awareness of the relevant circumstances and likely conse- quences"; as ruled by the 1970 U.S. supreme Court (Brady v. US, 397 US 742 at 748). I've given no such "waivers".

3.  These studies also prove that a shrewd and crimi- nal Constructive Fraud has been slipped over the "UNITED STATES OF AMERICA" by a corporate federal #2--"UNITED STATES" and accomplices under counter- feit "color of law" * * *. By never-repealed American Law, such sources of past and present Criminal Element in (and behind) Government, here- inafter referred to as the "CEG", should be brought to Justice in a Constitutional Court for aiding and abetting this Fraud as willing Accom- plices. It is for such Court with a 12-member Jury of Peers to decide who is and isn't Guilty among personnel of government, media, schools, lawyers, accountants, clergy and other pushers of misinformation mind-set propaganda in this and related regards, thank God.

4.  Due to such shrewd entrapments, over the years I unwittingly signed many of the related documents or contracts, some even under the foreign "per- jury" jurat as was supposedly required. With American Law On this Citizen's side, I hereby REVOKE all such signatures and render them null and void except for those that I choose to have measured as being under "TDC" (threat, duress and/or coercion), past and now. This is also my Lawful Notice that all such signatures of mine in the future, with such governmental or otherwise- adhesioned sources, are to be considered as under "TDC", whether appearing therewith or otherwise and including banks etc. * * *

5.  With this accurate knowledge, I Lawfully "squarely challenge" the fraudulent usurping-octopuslike JURISDICTION/AUTHORITY cited in item #2 that does NOT apply to me * * *. * * * For fairness, IRS agents generally lack Lawful "Delegation of Au- thority", and their so-called "Form 1040" seems to be bogus concerning me.

6.  With all of the above in mind, it appears that this private Citizen is by Law as "Foreign" and a

"Non-Resident Alien" * * *.

On December 10, 1996, petitioners jointly executed a decla-
ration in which they stated the following:

> I, Marvin L. Barmes/Barbara J. Barmes, hereby declare
> that I do not have nor have I had any income from
> Alcohol, Tobacco and Firearms.  I also declare that I
> do not have nor have I had a contract with the Depart-
> ment of the Treasury to manufacture, sell, or distrib-
> ute alcohol, tobacco, or firearms.
> All gasoline used is and was purchased at a gasoline
> service station.
> I am not a federal employee.
> I am not a corporation or partnership.
> I am not effectively connected with the conduct of a
> trade or business within the United States.
> I was not involved in any revenue taxable activity.
>
> I declare under penalty of perjury under the laws of
> the united [sic] States of America that the foregoing
> to the best of my knowledge and belief is true and
> correct.

Respondent's Communications with Petitioners with Respect
to Sandbar Wholesale Trust and Sandbar Real Estate Trust

On May 1, 1997, respondent's revenue agent Rosetta Arnold

(revenue agent Arnold) issued two letters (revenue agent Arnold's

two letters dated May 1, 1997), one of which was addressed to

"Sandbar Real Estate Trust, Attn:  Marvin and Barbara Barmes,

Managing Agents" and the other of which was addressed to "Sandbar

Wholesale Trust, Attn:  Marvin and Barbara Barmes, Managing

Agents".  Revenue agent Arnold's two letters dated May 1, 1997,

were identical in content, except that one letter referenced

Sandbar Real Estate Trust and the other letter referenced Sandbar

Wholesale Trust.  In those two letters, revenue agent Arnold

stated that respondent had no record of receiving Form 1041, U.S. Fiduciary Income Tax Return (Form 1041), for either of the two trusts for the tax periods ended 1995 and 1996. Revenue agent Arnold further stated in those two letters:

> If you are required to file the returns, but have not done so, we are requesting these returns to be filed by May 16, 1997. Please submit the following information by May 16, 1997 * * *.
>
> > - Completed returns
> > - A copy of the managing agent's compensation agreement referenced in the trust agreement
> > - A copy of Schedule A and the Addendum referred to in the trust document
>
> > *     *     *     *     *     *     *
>
> If you were not required to file returns for the periods indicated, please explain why you are not [sic] longer liable in the space provided below.

On May 8, 1997, Mr. Barmes responded to revenue agent Arnold's two letters dated May 1, 1997. Mr. Barmes made identical responses in the space provided on the second page of each of revenue agent Arnold's two letters dated May 1, 1997. That response consisted of the following statement: "No beneficiary disbursements made. No K-1's necessary."

On May 14, 1997, revenue agent Arnold issued a letter addressed to "Marvin and Barbara Barmes, Managing Agents" (revenue agent Arnold's letter dated May 14, 1997). That letter stated in pertinent part:

> We have received your response on May 9, 1997 to our May 1, 1997 letters requesting the tax returns (1041) for Sandbar Wholesale Trust and Sandbar Real Estate

Trust for the tax years of 1995 and 1996.  Based on your response, it appears that these two entities are required to file income tax return [sic] per Internal Revenue Code Section 6012(a)(4).  However, we have no records of receiving these tax returns.

If you have filed these returns please provide us a copy by May 21, 1997.  If you have not filed these returns, we are requesting these returns be filed by May 28, 1997. * * * The following information should be submitted to the address listed above by <u>May 28, 1997</u>:

- Completed returns
- A copy of the managing agent's compensation agreement referenced in the trust agreement
- A copy of Schedule A and the Addendum referred to in the trust document.

On May 16, 1997, Mr. Barmes responded in writing (Mr. Barmes' letter dated May 16, 1997) to revenue agent Arnold's letter dated May 14, 1997.  Mr. Barmes' letter dated May 16, 1997, stated in pertinent part:  "According to our CPA, Gregory P. Karl out in California our Pure Trust organization has no tax requirements according to the Internal Revenue Service."  Mr. Barmes attached to that letter copies of the Karl letter and the Felthaus letter, which Sovereignty included in its promotional materials and provided to petitioners.

On August 4, 1997, revenue agent Arnold responded in writing (revenue agent Arnold's letter dated August 4, 1997) to Mr. Barmes' letter dated May 16, 1997.  Revenue agent Arnold's letter dated August 4, 1997, stated in pertinent part:

     We have reviewed your response to our letter of May 14, 1997 requesting that you file trust returns for the Sandbar Real Estate Trust and the Sandbar Wholesale Trust.  You replied by providing us with a letter from

the Philadelphia Service Center stating that a "Pure Trust" organization has no filing requirements. We wish to advise you that the term "Pure Trust" is not used in the Internal Revenue Code. Whatever the name of the trust arrangement, the taxation of the entity must comply with the requirements of the Internal Revenue Code. These requirements are based upon the economic reality of the arrangement, not its nomenclature.

\* \* \* \* \* \* \*

In your response to out [sic] letter dated May 1, 1997, you stated that no beneficiary disbursements were made and that no Forms K-1 were necessary. From this statement, we conclude that the trusts have not treated you as their owners, although it appears to us it should have done so. We note also that you did not report the trust income, deductions and credits on your personal return for 1995. Accordingly, the trusts are required to file their own returns. With this law in mind, we request that you file Forms 1041 for the Sandbar Wholesale Trust and Sandbar Real Estate Trust with us on or before August 18, 1997. In addition, we request that you provide us with the following documentation for the tax year ended December 31, 1995:

1. The case [sic] receipts and disbursements journals for each trust;

2. The checking and savings accounts for each trust (along with cancelled checks and deposit slips);

3. A copy of the managing agent's compensation agreement referred to in the trust agreement;

4. A copy of Schedule A and the Addendum referred to in each trust document; and

5. Any statements issued to you from the trusts informing you of the trusts' income, deductions and credits that you are required to report on your personal return for 1995 * * *.

On September 29, 1997, Mr. Barmes responded in writing (Mr. Barmes' letter dated September 29, 1997) to revenue agent Ar-

nold's letter dated August 4, 1997.  Mr. Barmes' letter dated
September 29, 1997, stated in pertinent part:

> The Service has filed notices of federal tax lien
> against the trusts, which are based on allegations that
> the trusts are alter egos, nominee agents, constructive
> trusts and/or transferees.  The Service has further
> proceeded against Marvin and Barbara Barmes as if they
> are partners, filed notices of federal tax lien based
> on this alleged partnership status, and apparently
> proceeded against Marvin and Barbara Barmes individu-
> ally.

> It should be readily apparent that it is the
> Service which has prevented us from filing appropriate
> forms at this time.  Until the Service determines which
> legal theory pertains to us by taking a coherent posi-
> tion, our hands are tied. * * *

> * * * We need your help or binding assurance that
> if the trusts file Form 1041's, then all filing re-
> quirements have been met. * * *

In that letter, Mr. Barmes further asserted that Sandbar Whole-
sale Trust and Sandbar Real Estate Trust were "contractual
trusts", which he described as "not so much a trust as a contrac-
tual relationship based on trust form".

Notice of Deficiency

In the notice of deficiency (notice) issued to petitioners
for 1995, respondent determined, inter alia, to increase the 1995
Schedule C gross receipts and consequently petitioners taxable
income by $890,719.[32]  With respect to those determinations,

_____

[32]Although respondent determined to increase petitioners'
taxable income for 1995 as a result of respondent's determination
to increase petitioners' Schedule C gross receipts for that year,
for convenience we shall refer only to unreported gross receipts
(continued...)

respondent stated in the explanation of adjustments (explanation) included in the notice: "in the absence of adequate books and records an indirect method was utilized to determine Gross Receipts". Exhibit C of the explanation further detailed the method that respondent used to determine the increase in petitioners' 1995 gross receipts, as follows:

|  | December 31, 1994 |
|---|---|
| Total expense per 1994 Form 1040 as originally filed | $1,871,671 |
| Gross profit per 1994 Form 1040 as originally filed | 2,624,759 |
| Total expense to gross profit percentage (divide item 1 by 2) | 71.31% |

|  | December 31, 1995 |
|---|---|
| Total expense per 1995 Form 1040 as originally filed | $1,973,107 |
| Total expense to gross profit percentage (see above) | 71.31% |
| Corrected gross profit (divide item 4 by 5) | 2,766,943 |
| Amount per return | 1,876,224 |
| Adjustment to income | 890,719 |

In the notice, respondent also determined, inter alia, to disallow the depreciation deductions of $9,400 that petitioners claimed in the 1995 Schedule C.

Respondent also determined in the notice that petitioners are liable for 1995 for the accuracy-related penalty under section 6662(a).

Certain Pre-Trial Conduct of Petitioners

---

[32](...continued)
and not to unreported taxable income.

Petitioners' Position During Informal Discovery with
Respect to the Automobile Depreciation Deductions at Issue

In Part V, Section A of Form 4562 attached to petitioners'
1995 joint return, petitioners indicated that they had written
evidence to support the claimed business use during that year of
petitioners' two automobiles.  However, in a letter to respondent
dated July 11, 2000, that petitioners wrote during the course of
the parties' informal discovery in this case, petitioners indi-
cated that they did not have any mileage logs or other documenta-
tion with respect to the business use during 1995 of those two
automobiles.  In another letter to respondent dated July 17,
2000, petitioners indicated that such documentation did not
exist.

Petitioners' Trial Memorandum

On September 12, 2000, petitioners submitted their trial
memorandum (petitioners' trial memorandum) to the Court.  In
petitioners' trial memorandum, petitioners advanced, inter alia,
various arguments and contentions challenging the jurisdiction
and authority of the Court.  On September 19, 2000, we issued an
Order (September 19, 2000 Order) in which we directed that
petitioners' trial memorandum be filed as of September 12, 2000,
the date of its receipt by the Court.  In that Order, we also
stated that we found the arguments and contentions with respect
to the jurisdiction and authority of the Court that petitioners
advanced in petitioners' trial memorandum to be frivolous and/or

groundless. We reminded petitioners in the September 19, 2000 Order about the provisions of section 6673(a)(1)(A) and (B), which allows the Court to require a taxpayer to pay a penalty to the United States whenever it appears to the Court that a proceeding before it has been instituted or maintained by the taxpayer primarily for delay or when the taxpayer's position in such a proceeding is frivolous or groundless. We informed petitioners in the September 19, 2000 Order that "In the event that petitioners continue to advance frivolous and/or groundless contentions, the Court will be inclined to impose a penalty not in excess of $25,000 on petitioners under section 6673."

On October 2, 2000, petitioners filed a motion for clarification of the September 19, 2000 Order (petitioners' motion for clarification). In that motion, petitioners reasserted their arguments and contentions challenging the Court's jurisdiction and authority, which we had found in the September 19, 2000 Order to be frivolous and/or groundless.[33] On October 2, 2000, we denied petitioners' motion for clarification.

---

[33]In petitioners' motion for clarification, petitioners stated, inter alia:

> The Court has not provided any assistance to petitioners which would enable them to evaluate whether or not to pursue their issue(s), and petitioners seek guidance from the Court. * * * the [September 19, 2000] Order was issued sua sponte, and petitioners have been provided no authority to examine which would explain why their position(s) is/are "frivolous and/or groundless."

<u>Petitioners' Motion To Dismiss</u>

On October 16, 2000, three days after we issued the October 13, 2000 Order compelling petitioners to produce the requested documents of Sandbar Wholesale Trust and Sandbar Real Estate Trust to counsel for respondent and one week before the date of trial in this case, petitioners filed a motion to dismiss (petitioners' motion to dismiss). In that motion, petitioners asked the Court to dismiss this case because the Court does not have jurisdiction over it. In support of petitioners' motion to dismiss, petitioners stated:

> As grounds for this motion, petitioners would show the Court that the statutory notice of deficiency was not executed by the Commissioner of Internal Revenue.
>
> The statutory notice of deficiency at issue in this case, although containing the Commissioner's name, was executed by "R. Arnold." * * *
>
> Rule 13 of the United States Tax Court expressly provides that "the jurisdiction of the Court depends (1) in a case commenced in the Court by a taxpayer, upon the issuance <u>by the Commissioner</u> of a notice of deficiency in income...."
>
> * * * the term Commissioner * * * means the Commissioner of Internal Revenue, personally.

On October 19, 2000, we issued an Order (October 19, 2000 Order) in which we denied petitioners' motion to dismiss. In that Order, we stated, inter alia:

> The Court finds the * * * contentions of petitioners [advanced in their motion to dismiss] to be groundless and frivolous. The Court notes that petitioners continue to advance in this case what the Court finds to be frivolous and groundless contentions. See sec.

6673(a)(1); see also the Court's Order dated September 19, 2000.

OPINION

Preliminary Matters

At trial, petitioners chose not to testify, did not call any other witnesses, and, except for the joint exhibits attached to the parties' stipulation of facts, introduced no documentary evidence into the record. Instead, in support of their position regarding the determination in the notice that they have unreported Schedule C gross receipts for 1995, petitioners advance, inter alia, the following arguments with respect to that determination: (1)(a) "the Commissioner must introduce some reasonable foundation supporting the tax deficiency in order to preserve the presumption of correctness", and (b) even if such a foundation exists, respondent's method of reconstructing petitioners' unreported Schedule C gross receipts for 1995 is arbitrary; and (2) respondent has the burden of proof. In support of their position regarding the determination in the notice disallowing the claimed 1995 Schedule C depreciation deductions with respect to petitioners' two automobiles, petitioners rely, inter alia, on certain facts that the Court found in Barmes v. Commissioner, T.C. Memo. 2000-254, affd. per curiam without published opinion __F.3d__ (7th Cir., June 19, 2001).

Petitioners' Position Regarding
the Presumption of Correctness

According to petitioners,

Unless some evidence supports an inference that the
taxpayer was involved in the business alleged in the
notice of deficiency during the period covered by the
notice, "an assessment may not be supported even where
the taxpayer is silent." * * * .

* * * Therefore, before the Barmeses have any
burden to present evidence in opposition to the Commis-
sioner's deficiency notice, the Commissioner is re-
quired to present substantive evidence that the
Barmeses received the unreported income asserted.
Otherwise, the Commissioner is not entitled to a deci-
sion in its favor.

Here, there was no evidence showing the predicate
fact that the Barmeses received the unreported income.
* * * [Fn. ref. omitted.]

The U.S. Court of Appeals for the Seventh Circuit (Court of

Appeals), the Court to which an appeal in this case would nor-

mally lie, has held:

All that is required to support the presumption [of
correctness] is that the Commissioner's determination
have some minimal factual predicate. It is only when
the Commissioner's assessment is shown to be "without
rational foundation" or "arbitrary and erroneous," that
the presumption should not be recognized. * * *

Pittman v. Commissioner, 100 F.3d 1308, 1317 (7th Cir. 1996),

affg. T.C. Memo. 1995-243. Although certain cases on which

petitioners rely, see United States v. McMullin, 948 F.2d 1188,

1192 (10th Cir. 1991), and Weimerskirch v. Commissioner, 596 F.2d

358, 360 (9th Cir. 1979), revg. 67 T.C. 672 (1977), mention the

taxpayer's "receipt" of income, it is not necessary for the

Commissioner to show the taxpayer's receipt of income in order to satisfy the requirement of the Court of Appeals (and other courts) that in unreported income cases the Commissioner's determination have some minimal factual predicate. In this connection, the Court of Appeals has held that "The 'presumption of correctness' is appropriate where evidence existed which linked the taxpayers * * * with 'the tax-generating activity.'" Gold Emporium, Inc. v. Commissioner, 910 F.2d 1374, 1378 (7th Cir. 1990), affg. Malicki v. Commissioner, T.C. Memo. 1988-559. See Shriver v. Commissioner, 85 T.C. 1, 4 (1985), affd. per Order (7th Cir. 1986).

The record in this case links petitioners throughout 1995, the year at issue, to the two businesses, Barbara's Gift Shop and Barmes Wholesale. That record establishes that throughout that year petitioners operated, controlled the operations of, and controlled those two tax-generating activities. The instant record also shows that the creation of Sandbar Wholesale Trust in October 1995 did not change petitioners' operation of, control over the operations of, or control over Barbara's Gift Shop and Barmes Wholesale.

Petitioners also contend that the method that respondent used in the notice to reconstruct petitioners' Schedule C gross

receipts for 1995 is arbitrary.[34]  On the instant record, we reject that contention.  Petitioners refused to provide respondent with any information or documentation during respondent's examination of petitioners' 1995 joint return.  Under such circumstances, respondent was authorized to reconstruct petitioners' income by any reasonable means which clearly reflects income.  See, e.g., Zuhone v. Commissioner, 883 F.2d 1317, 1326 (7th Cir. 1989), affg. T.C. Memo. 1988-142; Petzoldt v. Commissioner, 92 T.C. 661, 686-687 (1989).  On the record presented, we find respondent's method of reconstructing petitioners' 1995 Schedule C gross receipts and the results generated by that

---

[34]In order to reconstruct petitioners' 1995 Schedule C gross receipts, respondent divided the total expenses reported in petitioners' 1994 Schedule C (i.e., $1,871,671) by the gross profit (total net gross receipts (i.e., total gross receipts reduced by returns and allowances) minus cost of goods sold) reported in that schedule (i.e., $2,624,759).  The resulting quotient was 71.31 percent.  The revenue agent then divided the total expenses claimed in petitioners' 1995 Schedule C (i.e., $1,973,107) by that percentage.  The result ($2,766,943) was determined to be the reconstructed Schedule C gross profit for 1995.  Respondent determined that the difference (i.e., $890,719) between that reconstructed gross profit of $2,766,943 and the gross profit reported in petitioners' 1995 Schedule C (i.e., $1,876,224) constituted petitioners' unreported 1995 Schedule C gross receipts.  (In this connection, petitioners do not claim any returns and allowances or cost of goods sold in excess of the amounts of such items claimed in petitioners' 1995 Schedule C.)  Pursuant to the foregoing method of reconstructing petitioners' Schedule C gross receipts for 1995, respondent determined to increase petitioners' Schedule C gross receipts for that year by $890,719.

method to be reasonable.[35]  In fact, the method used by respon-
dent resulted in an amount of total Schedule C reconstructed
gross receipts for 1995 which was less than the total sales from
Barbara's Gift Shop and Barmes Wholesale for 1995 (i.e.,
$5,799,767) that Mr. Barmes reported to the State of Indiana in
the Indiana business tangible personal property assessment return
that he filed for those businesses for that year.  Under respon-
dent's method of reconstructing petitioners' 1995 Schedule C
gross receipts, the gross receipts from Barbara's Gift Shop and
Barmes Wholesale for 1995 equaled only $5,107,781 (i.e.,
$4,217,046 (gross receipts of $4,217,062 less returns and allow-
ances of $16 that were reported in petitioners' 1995 Schedule C)
plus $890,719 (unreported 1995 Schedule C gross receipts deter-
mined in the notice)), which is almost $700,000 less than the
total sales for Barbara's Gift Shop and Barmes Wholesale for 1995
that Mr. Barmes reported in the Indiana business tangible per-
sonal property assessment return.[36]

---

[35]The Court sustained a similar method of reconstructing
income in Markman v. Commissioner, T.C. Memo. 1987-407.

[36]As respondent points out, the reasonableness of respon-
dent's method of reconstructing petitioners' 1995 Schedule C
gross receipts and the results produced by that method is also
evidenced by the relationship of Schedule C gross profit to
Schedule C gross receipts.  The percentage of Schedule C gross
profit to reported Schedule C gross receipts for 1994 was 48.2
percent (i.e., 1994 gross profit of $2,624,759 divided by total
1994 reported gross receipts of $5,445,178).  If one were to use
that percentage (i.e., 48.2 percent) in order to calculate 1995
(continued...)

Petitioners' Position Regarding the Burden of Proof

Respondent advances the following alternative theories or principles in support of the determination in the notice to increase petitioners' Schedule C gross receipts for 1995: (1) The assignment of income theory; (2) sham trust principles; and (3) the grantor trust rules found in sections 671-679 (grantor trust rules). The notice did not expressly mention any of the foregoing theories or principles. Consequently, according to petitioners, those theories and principles are new matters under Rule 142(a) on which respondent has the burden of proof.

We need not decide whether petitioners' position that respondent has the burden of proof regarding the alternative theories advanced by respondent in support of the determination in the notice to increase petitioners' Schedule C gross receipts for 1995 is correct. The record establishes that petitioners had unreported 1995 Schedule C gross receipts from Barbara's Gift Shop and Barmes Wholesale in the amount determined by respondent in the notice. We would reach the same result no matter who has

---

[36](...continued) total gross receipts, the result would be $5,740,546 (i.e., the 1995 gross profit determined in the notice of $2,766,943 divided by 48.2 percent). The recalculated total gross receipts for 1995, determined by using the 1994 percentage of gross profit to total 1994 reported gross receipts, is remarkably close to the total sales of $5,799,767 that Mr. Barmes reported in the Indiana business tangible personal property assessment return as the total sales of Barbara's Gift Shop and Barmes Wholesale for 1995.

the burden of proof on that issue.

> Petitioners' Reliance on Facts Found in
> Barmes v. Commissioner, T.C. Memo. 2000-254

In support of their position regarding the depreciation deductions at issue, it appears that petitioners are arguing that under the doctrine of collateral estoppel the Court is required to find as facts in this case the facts that we found in Barmes v. Commissioner, T.C. Memo. 2000-254. Barmes involved, inter alia, petitioners' claim to Schedule C depreciation deductions for 1994 with respect to petitioners' two automobiles, which we rejected. The instant case involves, inter alia, petitioners' claim to Schedule C depreciation deductions for 1995 with respect to those same two automobiles.

In Commissioner v. Sunnen, 333 U.S. 591 (1948), the Supreme Court examined and discussed the doctrine of collateral estoppel as it applies in Federal income tax cases. The Supreme Court stated in pertinent part:

> Income taxes are levied on an annual basis. Each year is the origin of a new liability and of a separate cause of action. Thus if a claim of liability or non-liability relating to a particular tax year is litigated, a judgment on the merits is res judicata as to any subsequent proceeding involving the same claim and the same tax year. But if the later proceeding is concerned with a similar or unlike claim relating to a different tax year, the prior judgment acts as a collateral estoppel only as to those matters in the second proceeding which were actually presented and determined in the first suit. Collateral estoppel operates, in other words, to relieve the government and the taxpayer of "redundant litigation of the identical question of

the statute's application to the taxpayer's status."
* * *

      *       *       *       *       *       *       *

      * * * where two cases involve income taxes in
different taxable years, collateral estoppel must be
used with its limitations carefully in mind so as to
avoid injustice.  It must be confined to situations
where the matter raised in the second suit is identical
in all respects with that decided in the first proceed-
ing and where the controlling facts and applicable
legal rules remain unchanged. * * *

Id. at 598-600.

      We reject petitioners' apparent attempt to rely on the

doctrine of collateral estoppel to require us to find as facts in

this case the facts that we found in Barmes v. Commissioner,

supra.  Any such attempt misconstrues and misapplies that doc-

trine.  In determining here whether petitioners are entitled to

the depreciation deductions that they are claiming for 1995 with

respect to petitioners' two automobiles, we are in no way bound

by the facts that we found in Barmes.  In resolving the deprecia-

tion issue presented to us, we shall rely on the facts that we

have found are established by the record in this case, and not by

the facts that we found in Barmes were established by the record

in that case.

Respondent's Determination Regarding
Petitioners' Claimed Schedule C Gross Receipts

      During respondent's examination of petitioners' 1995 joint

return, petitioners refused to provide respondent's revenue agent

with any books, records, or other information with respect to the

items of income and deduction reported by petitioners in that return.  Consequently, respondent relied on the indirect method of reconstructing petitioners' 1995 Schedule C gross receipts described above.  See, e.g., supra note 34.  We have found that method and the results generated by that method to be reasonable. The only question that remains for our consideration is whether the unreported Schedule C gross receipts determined by respondent in the notice are taxable to petitioners.  On the record before us, we find that they are.

As discussed above, respondent advances three alternative theories or principles in support of respondent's determination that petitioners had unreported Schedule C gross receipts for 1995:  (1) The assignment of income theory; (2) sham trust principles; and (3) the grantor trust rules.  We shall address only the assignment of income theory because that theory resolves against petitioners the issue of whether they are taxable on the unreported Schedule C gross receipts that respondent determined in the notice.

As we understand their position regarding the unreported Schedule C gross receipts at issue, petitioners contend that the income which Barbara's Gift Shop and Barmes Wholesale generated after Sandbar Wholesale Trust was created on October 12, 1995, is income that Sandbar Wholesale Trust earned, and not income that petitioners earned.  That is because, according to petitioners,

after the creation of Sandbar Wholesale Trust on October 12, 1995, petitioners no longer held title to those two businesses or to the properties of those businesses.

Although the record shows that Sandbar Wholesale Trust was established on October 12, 1995, the record does not show that petitioners transferred Barbara's Gift Shop and Barmes Wholesale, or any properties of those businesses, to that trust on that date or at any other time during 1995.[37] On the instant record, we reject petitioners' contention that petitioners transferred Barbara's Gift Shop and Barmes Wholesale, or any properties of those two businesses, to Sandbar Wholesale Trust on October 12, 1995, or at any other time during the year at issue.[38]

---

[37]The record shows that Mr. Barmes made initial cash deposits of $1,000 into each of the three Community Bank accounts that he opened on Oct. 13, 1995, with respect to Sandbar Wholesale Trust in the names of Sandbar Wholesale Trust--Barbara [sic] Gift Shop, Sandbar Wholesale Trust--Barmes Wholesale, and Sandbar Wholesales [sic] Trust--Payroll. However, the record does not establish that the cash used to make those deposits was the property of Barbara's Gift Shop and/or Barmes Wholesale. The record does show that on Oct. 18, 1995, petitioners gratuitously transferred to Sandbar Real Estate Trust by warranty deed the Fritchton property and the two parcels of real estate on which the two business locations were situated. We express no opinion herein as to whether such transfers should be recognized for Federal tax purposes.

[38]The record establishes only that petitioners made certain claims to, inter alia, respondent and the State of Ind. that they transferred Barbara's Gift Shop and Barmes Wholesale and the properties of those two businesses to Sandbar Wholesale Trust. For example, the record includes a three-page document relating to the Sandbar Wholesale Trust that was filed with the Knox County Recorder's Office on October 12, 1995, which respondent

(continued...)

The record before us establishes that throughout 1995, including the period after the creation of Sandbar Wholesale Trust, petitioners operated, controlled the operations of, and controlled Barbara's Gift Shop and Barmes Wholesale. On that record, we find that throughout 1995 petitioners controlled the earning of the income of those two businesses. Consequently, regardless of whether petitioners transferred the two businesses and/or the properties of those businesses to Sandbar Wholesale Trust after it was created, on the instant record, petitioners are taxable under the assignment of income doctrine on the unreported 1995 Schedule C gross receipts at issue in this case. See Lucas v. Earl, 281 U.S. 111 (1930).

The "first principle of income taxation" is that income must

---

[38](...continued)
obtained from that office. That document contained, inter alia, the following statement: "Trustee(s) have * * * acknowledged the conveyance, delivery and acceptance of certain * * * property listed in Schedule A and Addendum to be held in Trust according to the terms, herein." The record does not contain the Schedule A and Addendum to which the document in question referred. Nor does the record contain any other documents evidencing any alleged conveyance to Sandbar Wholesale Trust or any other trust documents relating to that trust. During respondent's examination of petitioners' 1995 joint return, petitioners did not provide respondent's revenue agent with any trust documents relating to Sandbar Wholesale Trust. During the discovery process in this case, petitioners refused to comply with the Court's October 13, 2000 Order compelling petitioners to produce to counsel for respondent, inter alia, any trust documents relating to Sandbar Wholesale Trust that respondent requested in respondent's request for production of documents. During the trial in this case, petitioners did not offer any such documents into the record.

be taxed to the one who earns it.  Commissioner v. Culbertson, 337 U.S. 733, 739-740 (1949) (citing Lucas v. Earl, supra). Attempts to subvert this principle by diverting income away from its true earner to another entity by means of contractual arrangements, however cleverly drafted, are not recognized as dispositive for Federal income tax purposes, regardless of whether such arrangements are otherwise valid under State law. See Vercio v. Commissioner, 73 T.C. 1246, 1253 (1980); see also Schulz v. Commissioner, 686 F.2d 490, 493 (7th Cir. 1982), affg. T.C. Memo. 1980-568.  The "true earner" of income is the person or entity who controlled the earning of such income, rather than the person or entity who received the income.  See Vercio v. Commissioner, supra at 1253 (citing Wesenberg v. Commissioner, 69 T.C. 1005, 1010 (1978)); see also Commissioner v. Sunnen, 333 U.S. at 604 ("The crucial question remains whether the assignor retains sufficient power and control over the assigned property or over receipt of the income to make it reasonable to treat him as the recipient of the income for tax purposes.").

Even if, as petitioners contend, they transferred Barbara's Gift Shop and Barmes Wholesale and/or the properties of those businesses to Sandbar Wholesale Trust after it was created, based on our examination of the entire record before us, we find that petitioners' attempt to divert the income of those two businesses to Sandbar Wholesale Trust constituted an invalid assignment of

income.  Consequently, we sustain respondent's determination that petitioners have unreported Schedule C gross receipts for 1995 in the amount of $890,719.

Respondent's Determination Regarding
Petitioners' Claimed Depreciation Deductions

In the notice, respondent disallowed the depreciation deductions that petitioners claimed in the 1995 Schedule C with respect to petitioners' two automobiles.

Deductions are strictly a matter of legislative grace, and petitioners bear the burden of proving that they are entitled to any deductions claimed.  See INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

Section 167(a) allows a deduction for a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in a trade or business or held for the production of income. Section 274(d)(4) operates to disallow any deduction otherwise allowable under, inter alia, section 167 with respect to, inter alia, any "listed property" unless the taxpayer satisfies the substantiation requirements of that section.[39]  "Listed property"

---

[39]Sec. 274(d) provides in pertinent part:

SEC. 274.  DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC.,
          EXPENSES.

(d) Substantiation Required.--No deduction or credit shall be allowed--

    *       *       *       *       *       *       *
                                        (continued...)

is defined in section 280F(d)(4) to include passenger automobiles. See sec. 280F(d)(4)(A)(i). As pertinent here, petitioners may satisfy the substantiation requirements of section 274(d) and the regulations thereunder by adequate records or by sufficient evidence corroborating their own statements. See sec. 274(d)(4); sec. 1.274-5T(c)(1), Temporary Income Tax Regs., 50 Fed. Reg. 46016-46017 (Nov. 6, 1985).

In support of the automobile depreciation deductions at issue, petitioners rely on certain facts that we found in Barmes v. Commissioner, T.C. Memo. 2000-254, and on certain factual allegations not supported by the record that they advance in their briefs. We rejected above petitioners' reliance on certain facts that we found in Barmes, supra. We also reject petitioners' reliance on certain factual allegations in their briefs. See Rule 143(b). On the record before us, we find that petitioners have failed to establish that they used petitioners' two automobiles in a trade or business or that they held such automobiles for the production of income. See sec. 167(a).

---

[39](...continued)

    (4) with respect to any listed property (as defined in section 280F(d)(4)),

unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement (A) the amount of such expense or other item, (B) the time and place of the * * * use of the facility or property * * *, (C) the business purpose of the expense or other item * * *.

Assuming arguendo that petitioners had established that they used petitioners' two automobiles in a trade or business or that they held such automobiles for the production of income, petitioners must satisfy the substantiation requirements of section 274(d)(4) and the regulations thereunder. Petitioners concede that they kept no records with respect to the business use of petitioners' two automobiles. Consequently, petitioners may establish their entitlement to the depreciation deductions at issue only by introducing into the record in this case their own statements and sufficient evidence corroborating such statements. See sec. 274(d)(4); sec. 1.274-5T(c)(1), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985). Petitioners introduced no evidence at trial that supports their position with respect to the depreciation deductions at issue. On the instant record, we find that petitioners have failed to establish that they satisfy the substantiation requirements of section 274(d)(4) and the regulations thereunder regarding those deductions.

Based on our examination of the entire record before us, we find that petitioners have failed to establish their entitlement to the depreciation deductions at issue. Consequently, we sustain respondent's determination with respect to those claimed deductions.

Respondent's Determination Regarding the
Accuracy-Related Penalty Under Section 6662(a)

In the notice, respondent determined that petitioners are

liable for the year at issue for the accuracy-related penalty under section 6662(a) and asserted the following alternative grounds for the imposition of that penalty: Negligence under section 6662(b)(1) and a substantial understatement of income tax under section 6662(b)(2).

Petitioners bear the burden of proving that they are not liable for the accuracy-related penalty under section 6662(a). See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Section 6662(a) imposes an accuracy-related penalty equal to 20 percent of the underpayment resulting from, inter alia, negligence or disregard of rules or regulations, see section 6662(b)(1), or a substantial understatement of income tax, see section 6662(b)(2). For purposes of section 6662(a), the term "negligence" includes any failure to make a reasonable attempt to comply with the Code, and the term "disregard" includes any careless, reckless, or intentional disregard. See sec. 6662(c). Negligence has also been defined as a lack of due care or failure to do what a reasonable person would do under the circumstances. See Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), affg. T.C. Memo. 1991-179; Antonides v. Commissioner, 91 T.C. 686, 699 (1988), affd. 893 F.2d 656 (4th Cir. 1990). An under-statement is equal to the excess of the amount of tax required to be shown in the tax return over the amount of tax shown in the tax return, see sec. 6662(d)(2)(A), and is substantial in the

case of an individual if it exceeds the greater of 10 percent of the tax required to be shown or $5,000, see sec. 6662(d)(1)(A).

The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment if it is shown that there was reasonable cause for, and that the taxpayer acted in good faith with respect to, such portion. See sec. 6664(c)(1).

Petitioners introduced no evidence and advance no contentions with respect to the accuracy-related penalty under section 6662(a). On the record before us, we find that petitioners have failed to show that they were not negligent and did not disregard rules or regulations within the meaning of section 6662(b)(1), or otherwise did what a reasonable person would do, with respect to any portion of the underpayment for 1995. On that record, we further find that petitioners have failed to show that they acted with reasonable cause and in good faith with respect to any portion of the underpayment for that year.[40] See sec. 6664(c).

Based on our examination of the entire record before us, we find that petitioners have failed to establish any error in respondent's determination that they are liable for the year at issue for the accuracy-related penalty under section 6662(a).

---

[40]We also find on the record before us that there is a substantial understatement of tax under sec. 6662(b)(2). Petitioners showed no tax in petitioners' 1995 joint return. The tax required to be shown in that return, as calculated by respondent in the notice, is $315,478, and we have sustained all of respondent's determinations in the notice.

Accordingly, we sustain respondent's determination with respect to that penalty.

Penalty Under Section 6673(a)(1)

On brief, respondent asks the Court to require petitioners to pay a penalty to the United States pursuant to section 6673(a)(1).

Section 6673(a)(1) authorizes the Court to require a taxpayer to pay to the United States a penalty in an amount not to exceed $25,000 whenever it appears to the Court that, inter alia, the taxpayer's position in a proceeding before it is frivolous or groundless. See sec. 6673(a)(1)(B). The Court may impose a penalty under section 6673(a)(1)(B) even if it finds that not all of the taxpayer's arguments are frivolous or groundless. See Sloan v. Commissioner, 102 T.C. 137, 148 (1994), affd. 53 F.3d 799 (7th Cir. 1995).

A position is frivolous when it is "contrary to established law and unsupported by a reasoned, colorable argument for change in the law." Coleman v. Commissioner, 791 F.2d 68, 71 (7th Cir. 1986). The word "groundless" is a word of common usage. Webster's Third New International Dictionary Unabridged 1003 (1993) provides the following definition of that word: "having no ground or foundation: lacking cause or reason for support".

In support of respondent's position that the imposition on petitioners of a penalty under section 6673(a)(1) is appropriate,

respondent points to (1) petitioners' trial memorandum that the Court had filed as of September 12, 2000, the date of its receipt by the Court, (2) the Court's September 19, 2000 Order directing that that trial memorandum be filed, (3) petitioners' motion to dismiss filed on October 16, 2000, and (4) the Court's October 19, 2000 Order denying that motion. In the September 19, 2000 Order, we stated that we found the arguments and contentions with respect to the jurisdiction and authority of the Court that petitioners advanced in petitioners' trial memorandum to be frivolous and/or groundless. We also reminded petitioners in the September 19, 2000 Order about section 6673(a)(1) and informed them that "In the event that petitioners continue to advance frivolous and/or groundless contentions, the Court will be inclined to impose a penalty not in excess of $25,000 on petitioners under section 6673." In the October 19, 2000 Order, we found the contentions of petitioners that the Court lacks jurisdiction over the instant case because the notice issued to petitioners was not personally signed by the Commissioner of Internal Revenue to be frivolous and groundless. We further noted in the October 19, 2000 Order that petitioners were continuing to advance in this case what we found to be frivolous and groundless contentions, and we cited in that Order our September 19, 2000 Order, in which we indicated that we would be inclined to impose a penalty under section 6673 in the event that peti-

tioners continued to advance frivolous and/or groundless contentions.

According to respondent, after the Court issued the September 19, 2000 Order, in which we found the arguments and contentions with respect to the Court's jurisdiction and authority that petitioners advanced in their trial memorandum to be frivolous and/or groundless and in which we reminded petitioners about section 6673(a)(1), petitioners continued to advance contentions in their motion to dismiss filed on October 16, 2000, which the Court found in the October 19, 2000 Order to be frivolous and groundless. Consequently, respondent argues, the Court should impose a penalty on petitioners under section 6673(a)(1).

Petitioners do not address the reasons advanced by respondent in support of respondent's position that the Court should impose a penalty under section 6673(a)(1). Instead, petitioners argue that the imposition of such a penalty is not appropriate in the instant case because they refrained from presenting at trial and on brief (1) the same arguments and contentions challenging the Court's jurisdiction and authority that they had advanced in petitioners' trial memorandum and (2) "any challenge whatsoever to the Court's jurisdiction and authority."

On the record before us, we reject petitioners' position. Petitioners first appear to be taking the position that the September 19, 2000 Order cautioned petitioners only against

continuing to advance the specific arguments and contentions which they had presented in their trial memorandum and which we found in that Order to be frivolous and/or groundless. Any such position ignores the September 19, 2000 Order. That Order stated: "In the event that petitioners continue to advance frivolous and/or groundless contentions, the Court will be inclined to impose a penalty not in excess of $25,000 on petitioners under section 6673." The September 19, 2000 Order did not advise petitioners that the Court will be inclined to impose a penalty under section 6673 only in the event that they continue to advance the same arguments and contentions that they presented in their trial memorandum.

Petitioners also appear to be taking the position that we should not impose a penalty under section 6673(a)(1) because they refrained from making any challenge whatsoever to the Court's jurisdiction and authority at trial and on brief. That position ignores the reasons that respondent advances on brief in support of the imposition of a penalty under section 6673(a)(1). Those reasons are that, after we informed petitioners in the September 19, 2000 Order that we would be inclined to impose a penalty under section 6673(a)(1) if they continued to advance frivolous and/or groundless contentions, petitioners continued to advance frivolous and groundless contentions challenging the Court's jurisdiction in petitioners' motion to dismiss that they filed on

October 16, 2000.  We agree that the reasons presented by respondent warrant imposition in the instant case of a penalty under section 6673(a)(1).

By continuing to assert after the Court issued the September 19, 2000 Order frivolous and groundless contentions in the motion to dismiss that petitioners filed on October 16, 2000, petitioners consumed the time and effort of the Court, which otherwise could have been devoted to resolving bona fide claims of other taxpayers.  See Coleman v. Commissioner, supra at 72; Cook v. Spillman, 806 F.2d 948 (9th Cir. 1986), affd. per curiam.  Based on our examination of the entire record before us, we find that, pursuant to section 6673(a)(1)(B), the imposition of a penalty in the amount of $2,000 is appropriate in this case.

We have considered all of the contentions and arguments of petitioners that are not discussed herein, and we find them to be without merit and/or irrelevant.

To reflect the foregoing,

An approriate order will be issued and a decision will be entered sustaining respondent's determinations and imposing a penalty under section 6673(a)(1).